(No. 6609.   April 22, 1939.)

BYRON E. LOOMIS, Respondent, v. ORA S. GRAY, Appellant.

[90 Pac. (2d) 529.]

194

Richards & Haga, for Appellant.

Martin & Martin, for Respondent.

HOLDEN, J.—J. P. Gray and Ora S. Gray were married in 1915. Shortly thereafter Gray deeded his wife, as a wedding present, a lot located at Mesa. When the Grays later moved from Mesa to Nampa, Gray sold the lot for $4,-000 and gave appellant the money, later investing it in the Robinson-Buick Co., a concern engaged in the automobile business at Nampa, which operated both Buick and Chevrolet agencies. In 1925, after the Grays moved from Mesa to Nampa, a co-partnership was formed by W. R. Showalter and appellant, under the firm name of Showalter Chevrolet Co. A deal was then made with the Robinson-Buick Co. by Showalter and Gray, whereby the Chevrolet agency, cars and parts, representing appellant's interest in the Robinson-Buick Co., were taken over by the co-partnership and Showalter became the manager of the co-partnership business.

At some time prior to May 25, 1927, Gray and respondent Byron E. Loomis, cousins, met at Portland, Oregon, where Loomis resided. The matter of forming a partnership for the purpose of engaging in the automobile business was suggested by Gray. In response to the suggestion, respondent stated he did not care for such an arrangement. As a result of further conversation between the two, and a later long-distance phone call from Gray to respondent, the latter inclosed his check to Gray for the sum of $15,000, in a brief note, reading:

"Dear J. P. (Gray)

Am in a big rush to write but here's the money and good luck.

B. E. L."

May 25, 1927, appellant signed at Nampa, Idaho, the promissory note sued upon, after which Gray endorsed thereon: "I hereby guarantee payment of the within note. (Signed) J. P. Gray." Gray then forwarded the note to respondent. By the terms of the note appellant promised to pay respondent the sum of $15,000 (the amount of respondent's check) within a year, with interest thereon at the rate of 10% per annum. Gray also mailed, along with the note, the following:

"Dr. Byron E. Loomis,
    Morgan Bldg.,
        Portland, Ore.
Dear Sir:—

In consideration of your having loaned to my wife, Ora S. Gray this date, the sum of fifteen thousand dollars, in evidence of which she gave her note, I hereby agree to pay you as a bonus or commission for making such loan 5% on said fifteen thousand dollars from this date until paid, and further agree to purchase this note from you at face value and interest on Jan. 1, 1928, or any date thereafter that you may wish to dispose of it.

Yours very truly,

(Signed)                              J. P. GRAY."
JPG/OSG

With the borrowed money a Chevrolet automobile agency located at Weiser was purchased and operated for several years under the name of the Intermountain Chevrolet Co.

May 31, 1927, Gray wrote Loomis:
"Dear Byron:

I was at Weiser last week and failed to acknowledge promptly your check for $15,000 as I should have done, which I wish to do at this time, and thank you, although had I not gone so far with the deal, I would have given it up when I found that you were not anxious for it, but am positive that the revenue guaranteed you will be easily taken from the earnings of the business and a good profit left for looking after it.

Six carloads of automobiles have been ordered, and as soon as we have been operating a short time, I will let you know how it is going. . . . .

Sincerely,

J. P. GRAY."

June 8, 1928, Loomis wrote Gray as follows:
"Dear Jude,

In looking over my deposit for yesterday I noticed that the notes which I have of yours here dated May 25th and not having heard from you lately thought I had better write and remind you of the date.

The last time we talked about it, you suggested my letting it run for another year.

That is all right with me if you still feel the same, and I was only wondering if you were going to pay the interest at this time as I had rather figured on it in making a loan to Dr. DuBois who is building a new garage near you on Alder St.

I have a chance to loan him $25,000 on a first mortgage on a $90,000 property and the absolute security of the thing appeals to me . . . . "

June 9, 1928, Gray wrote Loomis as follows:

"Dear Byron:—

I have been away a good portion of the time during the past three weeks, and outside when here, and seem to have overlooked your interest. This is the rush season in the automobile business up here in the country, which necessitates carrying heavy stocks and considerable paper, and we are enclosing check for $1500 in payment of interest from May 25, 1927 to May 25, 1928, with the idea that it will not make any difference to you if the bonus check reaches you later in the season.

Chevrolets are selling better than ever, and we will have another very good fruit crop this season, which I have been looking after rather closely recently . . . . "

May 23, 1931, Gray wrote Loomis:

"Dear Byron:

I am enclosing check for $2250 of which $1500 is in payment of interest on note from May 25, 1930 to May 25, 1931, and $750 bonus for the same period . . . .

Things have not been so bad around here the past year, and at the present time automobiles are selling well, but I guess they are like liquor, people will have them and find the funds to pay for them and either that is the condition at Portland or times are good with you for there were two hundred sixty-four Chevrolets sold there last month . . . . "

August 7, 1931, appellant signed and acknowledged the following:

"CERTIFICATE OF NAMES OF PARTNERS OR OWNERS

Trade Name: INTERMOUNTAIN CHEVROLET CO.

I do hereby certify that business is being transacted at Weiser, in Washington County, Idaho, under the designation, name, or style of Intermountain Chevrolet Co.

That the true or real full name of the party or parties conducting or transacting or intending to conduct or transact said business or having an interest therein, and Post Office address or addresses of said person or persons are as follows:

| Name | Address |
|------|---------|
| Ora S. Gray | Nampa, Idaho |

We further certify that we are the identical persons named above, and the only persons conducting, transacting or having an interest in said business.

Witness our hands this 7th day of August, 1931.

ORA S. GRAY."

August 15, 1931, the certificate was filed at Weiser in the office of County Recorder of Washington County, at the request of T. O. Alme.

July 22, 1933, Gray wrote Loomis:

"Dear Byron:—

. . . . 

Conditions generally were such at the end of 1931, that I did not think anything should be taken out and of course should have written you but thought of course I would be at Portland soon, but I have not been there since July, 1930. This last spring when the 1932 season was completed I felt that something must be sent you even though it was not good business to make withdrawals, but upon checking back I found that you had received sixty percent for six years and felt that under those conditions you would not complain, but of course should have written you, have intended to, but going back into the harness again as many others have done the past year, I do not get around to everything that I should do or would like to. You mention being concerned relative to the safety of the amount due you which you need not be for you hold my wife's note and the deal was handled in that manner owing to your being a relative and did not

wish to take the natural chances of anyone in active business as I am, and under no circumstances have allowed her to sign a note or to endorse and while she is not making the profit that she did during good times she is making some and we will not allow anything to happen that will cause you a loss and I have every reason to believe that it will result in a profit. . . . . "

March 6, 1936, Gray wrote Loomis:

"Dear Byron:—

I should have replied to your last letter immediately but you asked for something definite and I held it on my desk which was already too full, with the idea that I had better wait until I could tell you just what I could do, and when, and it is still there.

There was no question in my mind from the middle of last summer until the unprecedented freeze in October, but what you would be paid in full this winter, but after losing at least $100,000 worth of apples unharvested on the trees, I have not been too sure of the next move, but suppose it is apples for they were never lost from freezing before, and do not look for it again . . . .

I did not intend to inform you of the loss at Weiser where your money was used, but your friend who stopped here enroute east asked questions which made it necessary to tell him. It was up to me to pay it, and I did not wish to appear to look for sympathy for the principal reason was very poor management, which I should not have stood for, but very foolishly I accepted the recommendation of Chevrolet representatives and employed as manager, a brother-in-law of Mr. Richmond, the zone manager and he turned out to be a bum, and I should have moved him quick, but Richmond was giving me about any agency I wished and it hardly looked that a small one like Weiser could hurt much, and he performed so badly that when I did fire him and the deal was boiled down, the loss was over $33,000.

I was afraid in 1929 that everything throughout the country was getting too good to be true, and started out to sell Portland, for while I cautioned Grout the necessity to operate more economically I could see he thought I was a crazy

farmer, and each time I was at Portland, there was more expansion, and I sold before the crash for enough to get out even but unfortunately took notes, and there is still $15,000 due on them with little chance to collect, which with the $18,-000 to clean the Weiser deal took $33,000 of our profit from the Chevrolet deal here, and in addition there is the $15,000 due you. This turns an automobile experience from the $4,-000 investment of Ora's that was run into a $30,000 profit in a short time to a loss, and is an additional warning not to spread out where you cannot keep an eye on the operation.

The young man here had far less experience than any of the others, but he listened, and when I told him early in 1929 that things were too good to last and to tighten up on the credit and sell carefully, he did, and while I have not seen any of his statements for a long time, he informs me that he is doing all right and his place of business looks as if he were. . . . .

The reason for her giving the note originally was that she had started in the automobile business and might as well continue, and that she already had profits of more than you were loaning her, but the Weiser and Portland deals wrecked her, and now I think you should have me on the notes for it would not seem but what I will come out all right for I am taking the soft way with the minimum profits from now on, passing up the others.''

.    .    .    .

''I am enclosing six notes for $2500 each one of which comes due each year beginning May 25, 1937, having made each due on or before the respective date so that they can be paid sooner if I clear up something to warrant it, which I expect to do, with the idea that you would not like the notes post dated to May 25th. I am dating them all March 7, when they should reach you if this letter gets out to-day or even tomorrow. This is on the basis of the information of Mr. Snow that you wanted new paper before the present note. should outlaw and smaller ones coming due so that payments would be made regularly also the concession made by your friend that 6% interest was enough which he considered liberal owing to my assuming all of the loss when I was endeavoring to make you a profit. The interest was

paid early in the life of the notes which was of considerable advantage to you, and while it will be paid to May 25, 1937, it is my understanding that a note must draw interest to be legal therefore I am making them all with interest from now and we can have the understanding that it will only be necessary to send you $2500 May 25, 1937, and each year thereafter $2500 and interest.''

March 10, 1936, Loomis wrote Gray:

''Mr. J. P. Gray

    721 Fifth Street, North

      Nampa, Idaho

Dear Jude:

I acknowledge receipt of yours of March 5, 1936, enclosing six notes signed by you in the sum of $2500 each, all dated March 7, 1936 bearing interest at 6%, first note maturing May 25, 1937 and on the same day of each year thereafter up to and including May 25, 1942.

I do not understand why you did not return me the note I sent you in the sum of $16,519.99 to be signed by you and Ora, which note was payable in eight semi-annual installments, first payment to be made on September 2, 1936, with interest at 6% per annum and next payment to be made on March 2, 1937, with interest at 6% per annum and thereafter on the 2nd of September and 2nd of March until the eight equal installments of $2,065 were paid in full.

Since this money was originally borrowed by you for Ora and Ora signed the original note, I think it is hardly fair for you to ask me to accept the six notes in the sum of $2500 each without Ora's signature.

I do not know what Dr. DuBois may have told you but it seems to me that if I am willing to reduce the interest to 8% from a previous interest and commission or bonus of 15% that it should be more than satisfactory to you and should indicate a desire on my part to do all I can under the circumstances. . . . . ''

Thereafter payments of interest on the note and also on the bonus contract were made as follows: June 9, 1928, $1500 on the note and $750 on the bonus contract; May 25, 1929, $1500 on the note and $750 on the bonus contract; May 25, 1930, $1500 on the note and $750 on the bonus

contract; May 23, 1931, $1500 on the note and $750 on the bonus contract. A total of $6,000 interest and $3,000 on the bonus contract, a grand total of $9,000.

March 24, 1936, Gray died and appellant was appointed administratrix of his estate. May 19, 1936, respondent commenced this action against appellant personally to recover the principal of said note together with an interest balance alleged to be due thereon. January 28, 1938, the case was tried before the court, sitting without a jury. April 20, 1938, findings of fact and conclusions of law were made and filed in favor of respondent and against appellant. The court applied on the note *pro tanto* the entire above-stated amount paid on the bonus contract and for interest. April 29, 1938, judgment against appellant was entered for the sum of $6,000. From the judgment, an appeal was prosecuted to this court.

It is not disputed that respondent loaned the sum of $15,000 nor is it seriously disputed that the investment, as hereinbefore pointed out, first in the Robinson-Buick Co., and later in the Showalter Chevrolet Co., was the separate property of appellant—in fact, that seems to be conceded by respondent.

Appellant contends that the common law disability of a married woman to borrow money and enter into contracts has not been removed in this state, except as to contracts for her own use or benefit, or for the use and benefit of her separate property. In support of the contention she relies upon sec. 31–904, I. C. A., and the decisions of this court construing that section. The statute was approved March 9, 1930, Session Laws 1903, p. 345. It has never been amended. We quote: "During the continuance of the marriage, the wife has the management, control and absolute power of disposition of her separate property, and may bargain, sell and convey her real and personal property and may enter into any contract with reference to the same, in the same manner, and to the same extent and with like effect, as a married man may in relation to his real and personal property: provided, that the husband shall be bound by such contracts to no greater extent or effect than his wife under similar circumstances would be

bound by his contracts." This court first considered and construed the above-quoted section in *Bank of Commerce v. Baldwin,* 12 Ida. 202, 85 Pac. 497. In that case we held that "a married woman cannot bind herself personally for the payment of a debt that was not contracted for her own use or for the use or benefit of her separate estate, or in connection with the control and management thereof or in carrying on or conducting business therewith."

The judgment of the trial court was reversed and the cause remanded with directions to grant a new trial. It was re-tried and again appealed. The decision on the second appeal is reported in *Bank of Commerce v. Baldwin,* 14 Ida. 75, 78, 93 Pac. 504, 17 L. R. A., N.- S., 676. It was said:

"We might rest our decision upon the opinion in the last appeal as being the law of the case, but since the question squarely arises on this appeal as to the liability of the wife as a surety or guarantor for the debt of a stranger, we have thought it best to pass on that point."

The court then proceeded to review a number of cases and to discuss the rule previously adopted and followed in this state with reference to the contracts and liabilities of married women and then said:

"The supreme court of this state has, through a continuous line of decisions for nearly twelve years, held that 'in order to charge the separate property of the wife and render it liable to levy and sale, it must be alleged in the complaint and proven that the debt was incurred for the use and benefit of her separate property or for her own use and benefit.' Sec. 2504, Rev. Stat., has lent a great deal of force to that conclusion, and that section stands to this day without amendment. Notwithstanding this interpretation of the statute as it has existed in this state, the legislature, although meeting biennially, never attempted in any way to change the rule or announced a different legislative intent until the act of March 9, 1903. When it did make a change, it simply abrogated the statute providing for a married woman becoming a sole trader and transferred the management and control and right of disposing of her separate property from her husband to her; and that trans-

fer of management, control and right of disposition granted a concurrent and commensurate power and authority to dispose of the same and contract in reference thereto. It is evident to us that had the legislature desired to change the rule as previously announced by this court and grant the wife the right to become surety and guarantor and to sign accommodation paper and go bail, it would have done so in clear and unmistakable terms.''

The next case arising under the amendatory act. (Sec. 31–904, *supra*), *Edminston v. Smith*, 13 Ida. 645, 92 Pac. 842, 121 Am. St. 294, 14 L. R. A., N. S., 871, cited and followed the Baldwin case. Due, however, to peculiarity of the facts there presented and the nature of the discussion, some misapprehension evidently arose in the minds of some of the judges who subsequently commented on the two cases. Since both opinions were written by the same Justice, it is safe to assume that, when writing the second opinion, the writer fully understood what he had actually held by the first opinion. The Edminston case was prosecuted against both husband and wife to recover a bill for board and lodging. The contract had been made and entered into by the wife. The husband denied liability because he did not incur the indebtedness. The wife denied liability on the ground that it was the husband's legal obligation and that it didn't concern her separate property and estate. A judgment was entered against both the husband and wife on the pleadings and they appealed.

A dual question thus arose over the sufficiency of the complaint and the nature of the liability. It was concluded the husband could be held under his statutory liability for necessaries furnished his family, and that the wife was liable on her direct promise to pay, because of the fact the provisions and accommodations were furnished for her personal use and benefit. The court, among other things, saying:

''The liability of the wife, if any, rests on her contract and promise to pay, while the husband's liability for a necessary, such as board and room, grows out of, and is incident to, his marital duties, and arises therefrom by operation of law. The wife is entitled to these necessaries at the husband's expense, but if he neglects to furnish them

and she cannot secure them on his credit, and can do so on the faith of her own promise to pay the bill, she is certainly entitled to procure them in that manner. If the creditor parts with his goods on the faith of the wife's promise to pay, he is entitled to recover against her if the debt is not paid. The fact that she is obliged to obligate herself can in no way relieve the husband of his duty and responsibility in the matter. The wife has a right, on the other hand, to have the husband holden for the debt so that if it can be collected from him, she may hold the husband, although he is not willing to part with his goods without the additional assurance of the wife's personal obligation to pay the debt."

The Baldwin case was again cited with approval and followed in *McFarland v. Johnson*, 22 Ida. 694, 701, 127 Pac. 911, with the following comment:

"In that case this court specifically held that under the act of March 9, 1903, a married woman is given the absolute control of her separate property and estate, and has the unqualified right of contract with reference to such property, and may sell and dispose of the same without the consent or approval of her husband, and that such statute has reference to the separate property of the wife and the management and control thereof, and the carrying on of business therewith, and the sale or disposal thereof and *contracts with reference thereto or for the benefit thereof.* In that case the court held that a married woman cannot bind herself personally for the payment of a debt that was not contracted for her own use or benefit or for the use or benefit of her separate estate, but that she can make such contracts where the liability was originally the wife's debt, or contract with reference to her separate property or estate."

The Baldwin case was next cited and followed in *Smith v. Schultz*, 23 Ida. 144, 150, 129 Pac. 640, where the court said:

"In this case it would appear that the property purchased did not become the separate property of the wife, and that it was not purchased for her separate use or benefit nor inured to the benefit of her separate estate. Her signature

to the note would not therefore, constitute security within the meaning of the provisions of the statute.''

Both the Baldwin and Edminston cases were cited in *Humbird Lumber Co. v. Doran*, 24 Ida. 507, 135 Pac. 66, in support of the following holding:

''The proof also shows that the consideration ($5,000) paid by appellant for this tract of land was paid in full to the husband, Joseph Doran. It being established that this land was the separate property of the husband and that the wife had no interest therein and that she received no part of the purchase price, she would not be liable for any breach of covenant of title contained in the deed and could not be held thereunder for the failure of title.''

In *Meier & Frank Co. v. Bruce*, 30 Ida. 732, 168 Pac. 5, we cited the Baldwin case and quoted with approval extracts from the opinion. That, however, involved an Oregon contract and was decided upon the Oregon statute.

In *Ness v. Coffer*, 42 Ida. 78, 87, 244 Pac. 145, this court cited and commented on both the Baldwin and Edminston cases and other Idaho cases and concluded:

''From the foregoing authorities it is clear that the common-law disability of a married woman to enter into contracts, to sue or be sued, has not been removed, otherwise than as stated in the exceptions, and that in order to charge the separate property of a married woman or render it liable to levy and sale for an indebtedness contracted by her, it must be alleged in the complaint and proven at the trial that the debt was incurred for her own use and benefit or in reference to the management and control or for the use and benefit of her separate property.''

In *Thomas v. Young*, 42 Ida. 240, 245 Pac. 75, we said:

''We hold that the ruling of the trial judge that the complaint failed to state a cause of action against the defendant, Pauline Young, was correct. This court has heretofore held that an action can only be prosecuted against a married woman where it is her own contract or for the use and benefit of her separate estate'' (citing *Bank of Commerce v. Baldwin* and other cases), and there is no contention here that she signed the contract or authorized anyone else to sign for her.''

And in the recent case of *Beckstead v. Gee,* 58 Ida. 758, 79 Pac. (2d) 293, we quoted with approval from the Baldwin case and other Idaho cases and concluded that an *appeal bond signed by a married woman* in a case to which she was not a party, was void and for that reason dismissed the appeal.

It will be observed that no matter how or in what form the question has arisen, this court has adhered to the rule first announced at the turn of the century in the Baldwin case, that "a married woman cannot bind herself personally for the payment of a debt that was not contracted for her own use or for the use or benefit of her separate estate, or in connection with the control and management thereof or in carrying on or conducting business therewith." But respondent contends appellant acquiesced in and ratified the acts of her husband and consequently, is liable. The following is a summary of the facts and circumstances upon which he bases his contention: That she typed and signed the promissory note upon which respondent seeks to recover and at the same time typed the bonus contract; that she typed the letters from her husband to the respondent, hereinbefore quoted, and consequently, knew what her husband was writing respondent about the loan; that in a letter from Gray to respondent, dated May 31, 1927, Gray stated: "Six carloads of automobiles have been ordered, and as soon as we have been operating a short time, I will let you know how it is going;" that in a letter from Gray to respondent, dated June 9, 1928, Gray said: "This is the rush season in the automobile business up here in the country, which necessitates carrying heavy stocks and considerable paper, and we are inclosing check for $1500 in payment of interest from May 25, 1927, to May 25, 1928, with the idea that it will not make any difference to you if the bonus check reaches you later in the season," and further that Chevrolets were selling better than ever; that May 23, 1931, Gray wrote respondent a letter in which he said that "Things have not been so bad around here the past year, and at the present time automobiles are selling well, but I guess they are like liquor, people will have them and find the funds to pay for them;" that August 7,

1931, appellant signed and acknowledged the above-quoted certificate, by which she certified in effect she was transacting business at Weiser under the name of Intermountain Chevrolet Co.; that July 22, 1933, Gray wrote respondent telling him he need not be concerned about the amount due him because he held appellant's note and that the "deal was handled in that manner owing to your being a relative and did not wish to take the natural chances of anyone in active business as I am, and under no circumstances have allowed her to sign a note or to indorse and while she is not making the profit that she did during good times she is making some and we will not allow anything to happen that will cause you a loss and I have every reason to believe that it will result in a profit;" that March 6, 1936, Gray wrote telling respondent: "The reason for her (appellant) giving the note originally was that she had started in the automobile business and might as well continue, and that she had profits of more than you were loaning her, but the Weiser and Portland deals wrecked her, and now I think you should have me on the notes, for it would not seem but what I will come out all right for I am taking the soft way with the minimum profits from now on, passing up the others;" that appellant did not object to the writing of any of the letters; that she did not write respondent she was not borrowing the money, that it was not to be used in her business and was not her debt; that her husband looked after her business in the Showalter Chevrolet Co., and that she left all the details of her own affairs to him.

Appellant, however, contends she did not ratify the acts of her husband. The following is a summary of the facts and circumstances upon which she bases her contention: That she both typed and signed the promissory note given respondent because her husband requested her to do so; that she did quite a little of her husband's personal typing work and that the letters written respondent were typed as a part of that work; that she signed the above-quoted certificate at her husband's request; that her husband did not buy the Weiser business for her; that the check for the amount of the loan was made payable to Gray and not to

her; that the borrowed money was not used for the benefit of her separate property; that she, personally, received no benefits from the loan, hence did not retain any; that she did not invest any of her personal funds in the Weiser business; that her husband invested the money borrowed from respondent in that business; that not a dollar of her personal funds was used to make any of the payments either on the bonus contract or interest on the note; that she told her husband she would rather he did not go into the Weiser business; that her husband asked her from time to time to sign papers and she did so, but often without reading them because she absolutely trusted him; that appellant was not present at Portland when the matter of the making of the loan was discussed by Gray and respondent; that respondent did not, either before or after the loan was made, discuss the matter with appellant, and that he never wrote her about it; that while Gray told respondent he wanted to use the money for the development of the automobile business at Nampa and that he thought appellant would give respondent her note, there is no evidence that either before or at the time the arrangements for the loan were made at Portland, Gray claimed to be acting as the agent of appellant, nor that he was authorized to so act, nor that he (Gray) had in fact ever spoken to her about the matter of borrowing money from respondent; that respondent himself testified he "agreed to let Mr. Gray (not appellant) have this amount" ($15,000), the husband to pay a 5 per cent bonus and his wife to sign a note.

Respondent earnestly insists that by signing the promissory note sued upon, by typing the letters from Gray to respondent, and by failure to speak or protest, appellant acquiesced in and ratified the acts of her husband and thereby made them her own and that the general rule governing ratification should be applied, to the effect that where one with full knowledge of the facts ratifies an agreement which another person has, without authority made, makes himself a party to it, as much as if the original agreement had been made with him (*Blackwell v. Kercheval*, 27 Ida. 537, 545, 149 Pac. 1060). On the other hand, appellant, with equal earnestness, contends that to require a wife to re-

pudiate the unauthorized acts of her husband would have a mischievous tendency; therefore, for reasons of sound public policy, no such duty is imposed upon the wife. She cites and relies upon *McLaren v. Hall*, 26 Iowa, 297, 305, where the supreme court of that state held: "Neither good law nor sound reason will require the wife to destroy the peace of her family and endanger the married relation by open repudiation or hostile conduct toward her husband, in order to save her property from liability for his unauthorized contracts."

Respondent, however, further insists that by failing to speak or protest, appellant is estopped to repudiate her husband's acts or to deny he acted for and as her agent. While appellant did not speak or protest other than to tell her husband she "would rather he did not go into the Weiser business," there is no evidence of an intent on the part of appellant to deceive respondent. The evidence simply is that she did not protest against nor repudiate the acts of her husband. In passing on the question of an estoppel by actions and conduct, Justice Field, in *Henshaw v. Bissell*, 18 Wall. 255, 271, 21 L. ed. 841, says: "For its application there must be some intended deception in the conduct or declarations of the party to be estopped or such gross negligence on his part as to amount to constructive fraud."

Furthermore, it is common knowledge that wives are not usually experienced in business, do not know what they may sign without making their separate property liable nor what they must not sign to avoid making it liable. Consequently, to require a wife to openly repudiate the acts of her husband in order to protect her property from liability for his unauthorized acts would make it necessary for the wife whenever her husband requested her to sign a paper, or for instance, type a letter, to closely interrogate him about the matter, and if still in doubt, to obtain legal advice. Such constant questioning would, no doubt, lead to misunderstandings, suspicion and turmoil, and thus largely destroy the peace and tranquility of the home which sound public policy would preserve. We, therefore, conclude the rule in *McLaren v. Hall, supra*, should be adopted and applied to the facts of this case. It follows the judgment must be, and it is, hereby

*reversed,* and the cause *remanded* with directions to the trial court to grant a new trial. Costs awarded to appellant.

Ailshie, C. J., Budge, Givens, Morgan, JJ., concur.

Petition for rehearing denied.