559 P.2d 1123

Mary O. WILLIAMS,
Plaintiff-Respondent,

v.

Harry PAXTON and Paul W. Bright,
Defendants-Appellants.

No. 11602.

Supreme Court of Idaho.

May 13, 1976.

On Rehearing Jan. 13, 1977.

Dennis L. Cain, Sallaz, Scanlan, Beer & Cain, Boise, for defendants-appellants.

Samuel Kaufman, Jr., Anderson, Kaufman, Anderson & Ringert, Boise, for plaintiff-respondent.

BAKES, Justice.

The pivotal question in this appeal is whether a judgment creditor who obtained judgment jointly against a married woman and her husband, based upon obligations under a contract which both she and her husband signed for the purchase of community property, may satisfy the judgment by execution upon the married woman's separate property.

## THE FACTS

The plaintiff respondent Mary O. Williams initiated this action against the defendant appellant Harry Paxton to prevent him from executing upon her residence to satisfy a joint judgment he had obtained against her and her husband Robert G. Williams. The plaintiff had owned the home before her marriage to Robert G. Williams on June 17, 1966, and at the time of their marriage it was her sole and separate property. According to the finding of the trial court, the home remained Mary Williams' separate property throughout her marriage to Robert Williams. Upon their divorce on June 14, 1971, it remained her separate property.

During the Williamses' marriage they acquired two thirds of the outstanding shares of stock in Boise Floor Covering, Inc., and they desired to acquire the remaining one third of the outstanding shares, all of which were owned by defendant Harry Paxton. On April 11, 1968, the Williamses both signed a contract in which they agreed to purchase Paxton's outstanding shares. The trial court found that the Williamses acquired Paxton's stock as community property. Shortly after signing the

contract with Paxton, the business failed and the Williamses were unable to make payments under the contract. On December 20, 1968, Paxton sued Robert and Mary Williams under the contract and attached Mary Williams' home. On August 28, 1969, he obtained judgment against both Robert and Mary Williams. On June 3, 1971, Paxton obtained an execution directing the sheriff to seize Mary Williams' home and notice it for sale to satisfy the judgment against her.

In late July or early August of 1971, Mary Williams became aware that Paxton had published notice that the sheriff would execute upon and sell her home to satisfy the judgment against her. On August 16, 1971, she initiated this action against Paxton, alleging that Paxton's judgment against her was for a community indebtedness and that her home was her separate property, asserting that he had no right to satisfy the judgment for a community indebtedness by execution upon her separate property, and praying that he be enjoined from executing upon her separate property and that she be awarded attorney fees for the prosecution of the action. The parties stipulated that the home would not be sold while Mary Williams' action was pending. The action was tried before the district court sitting without a jury. The district court entered judgment on Mary Williams' behalf, enjoining Paxton from satisfying his judgment against her by execution upon her separate property and awarding Mary Williams' attorney fees for the prosecution of her action. Paxton has appealed. We reverse.

## THE JUDGMENT OF THE TRIAL COURT AND RESOLUTION OF THE COLLATERAL ISSUES

Both at trial and upon appeal Paxton has argued (1) that he was entitled to execute upon Mary Williams' residence to satisfy his judgment against her because the residence was community property, not her separate property, at the time they entered into the contract; (2) but even if it

were her separate property at that time, Mary Williams had contracted for her own use or benefit or for the use and benefit of her separate estate, and thus Paxton was entitled to satisfy his judgment against her separate estate; and (3) even if the residence were her separate property, Mary Williams had represented to Paxton by her word or conduct that her separate property would serve as security for the purchase of the stock and Mary Williams should be estopped from denying that her separate property is liable for satisfaction of the judgment. The trial court found (1) that the residence had remained Mary Williams' separate property at all times during and after her marriage and had never been transmuted to community property during her marriage, (2) that the contract that she and her husband had entered into with Paxton was for the benefit of the community and not for the benefit of her separate property, and (3) that she had never by her word or conduct led Paxton to believe that her separate estate would serve as security for the community obligation. These findings, none of which were assigned as error and all of which are supported by substantial competent evidence, are binding upon us upon appeal. I.R.C.P. 52(a); *Nielson v. Davis*, 96 Idaho 314, 528 P.2d 196 (1974). Thus, we reject Paxton's arguments (1) that he was entitled to execute upon the home because it was community property, (2) that he was entitled to execute upon the home because the debt had been contracted for the use or benefit of Mary Williams' separate property, and (3) that because of her words or conduct she should be estopped from denying Paxton access to her separate property for satisfaction of the judgment against her.

▪ The trial court also concluded that because Mary Williams' residence was attached on December 20, 1968, and that because under I.C. § 8–539 the attachment lien had expired two years later on December 20, 1970, the attempt to sell the property under a levy of execution issued on June 3, 1971, was wrongful because it took place under an expired attachment. We agree with Paxton's assignment of error that the trial court's conclusion of law was incorrect. Although Paxton had no right to execute upon the property under the expired attachment, he had a right to execute upon the property for the enforcement of his judgment. I.C. § 11–104 provides that, "When the judgment is for money . . . the same may be enforced by a writ of execution; . . ." I.C. § 11–101 provides that, "The party in whose favor judgment is given may, at any time within five years after the entry thereof, have a writ of execution issued for its enforcement, . . ." Therefore, regardless of the time the original writ of attachment expired, on June 3, 1971, which was less than five years after Paxton had obtained judgment against the Williamses, he was entitled to a writ of execution to satisfy his judgment. Therefore, the trial court erred in holding that the attempt to levy upon the property was wrongful because Paxton's original writ of attachment had expired.

Thus, because Paxton's right to obtain a writ of execution to enforce his judgment had not expired, we must reach and decide the central issue presented by this appeal: may a judgment creditor proceed by execution against a woman's separate property to satisfy a joint judgment he has obtained against both her and her husband based upon their obligations under a contract which they both signed for the purchase of community property?

### THE CENTRAL ISSUE

*Statutory and decisional history upon the question.* The Idaho legislature adopted the community property system early in the Idaho territory's history. 1867 S.L., ch. IX, p. 65. When Idaho was admitted into the Union in 1890, there was already a considerable body of statutory law dealing with the community property system. R.S., 1887, §§ 2493–2512. Those statutes provided that, "The husband has the management and control of the separate prop-

erty of the wife . . . ," R.S. § 2498, except in cases in which the wife had acquired separate property after marriage in an instrument providing that the rents and profits from that property be applied to her sole and separate use, R.S. § 2497, or in cases in which the wife was living separate from her husband, R.S. § 2502. The revised statutes also provided that, "The husband has the management and control of the community property . . . ," R.S. § 2505, and that, "The separate property of the wife is not liable for the debts of her husband, but is liable for her own debts contracted before or after marriage." R.S. § 2504. Thus, although the statutes gave the wife a right of management or control of her separate property in only the narrowest of instances, they also recognized that the wife had some capacity to contract after marriage because they provided that the separate property of the wife was liable for her own debts contracted "before *or after*" marriage.

After reviewing these statutory provisions, this Court in the case of *Dernham & Kaufmann v. Rowley*, 4 Idaho 753, 44 P. 643 (1896), said with respect to separate property acquired by the wife after marriage in an instrument providing that the rents and profits from the property are to be applied to her sole and separate use that,

> "The management and disposal of this property being saved to the wife exclusively, she may certainly make any contract with reference to such property, *may pledge it for her own or her husband's debts*, or may convey it away if she so desires, . . . Any restriction upon her right to contract with reference to this species of property would be a restriction upon that power of management and disposal which the statute has given her." 4 Idaho at 757, 44 P. at 644 (emphasis added).

The Court also discussed the wife's power to dispose of her earnings and accumulations while living separate and apart

from her husband, which were also her separate property.

> "These accumulations being received by her and remaining necessarily in her possession, the management and control thereof must necessarily belong to her. Concerning this property, she may enter into contracts. Any other view would render such property valueless to her. When living separate and apart from her husband, the law gives her the right to dispose of her time and labor as she sees fit. Her earnings and accumulations thus acquired being granted to her as her separate property, . . . must carry with it the right of disposal, and therefore the right to contract with reference thereto." 4 Idaho at 757, 44 P. at 644.

In summation, this Court said:

> "It follows from this that the wife may contract debts for the use and benefit of her separate property, or for her own use and benefit, and thereby charge her property; but debts contracted by her husband for his own benefit, or for the use and benefit of the family of which he is the head, cannot expose the separate property of the wife to levy and sale, *although the wife may voluntarily become a surety therefor*. (*Bassett v. Beam*, [4 Idaho 106], 36 Pac. 501 [1894].)" 4 Idaho at 758, 44 P. at 645. (Emphasis added).

Thus, the Court in *Dernham* recognized that in those circumstances in which a married woman had the right of management and control of her separate property, she had the right to contract with respect to it, including the right to pledge it for a debt of the husband or to voluntarily become a surety for his debt. However, the Court soon retreated from the statements contained in *Dernham*. In *Jaeckel v. Pease*, 6 Idaho 131, 53 P. 399 (1898), a case in which both husband and wife had executed a promissory note, the Court said:

> "It was error to render a personal judgment against the wife for a community

debt. The wife cannot bind herself personally for the husband's debt, or for the debt of the community." 6 Idaho at 133, 53 P. at 400.

The restrictive view of the wife's capacity to contract taken in *Jaeckel* was followed during the next few years. *Strode v. Miller,* 7 Idaho 16, 57 P. 893 (1900).

In 1903, the legislature, in 1903, S.L. p. 345, amended the statutes dealing with community property and repealed R.S. § 2498, which had placed the management and control of the wife's separate property in her husband's hands, and enacted the following section, which is still in effect and is now codified as I.C. § 32–904:

"32–904. *Separate property of wife— Management.*—During the continuance of the marriage, the wife has the management, control and absolute power of disposition of her separate property, and may bargain, sell and convey her real and personal property, and may enter into any contract with reference to the same, in the same manner, and to the same extent, and with like effect, as a married man may in relation to his real and personal property: provided, that the husband shall be bound by such contracts to no greater extent or effect than his wife under similar circumstances would be bound by his contracts."

This section was first construed in *Bank·of Commerce, Ltd., v. Baldwin,* 12 Idaho 202, 85 P. 497 (1906). Although the section gave the wife the "management, control and absolute power of disposition of her separate property," the Court in *Baldwin* said:

"It should be borne in mind that all our legislation with reference to contracts, powers, and liabilities of married women must be viewed and construed as grants, instead of restriction of power and authority to contract." 12 Idaho at 209, 85 P. at 498.

The Court made this statement in spite of the fact that R.S. § 3220, now codified as I.C. § 29–101, provided: "All persons are capable of contracting, except minors, persons of unsound mind, and persons deprived of civil rights." The Court in *Baldwin* continued by quoting the following passage from *Dernham:*

" 'From this exposition it will clearly appear that in order to charge the separate property of the wife, or render it liable to levy and sale, it must be alleged in the complaint, and proven, that the debt was incurred for the use and benefit of her separate property, or was contracted by her for her own use and benefit.' [4 Idaho at 758]." 12 Idaho at 209, 85 P. at 498.

The Court in *Baldwin* ignored both R.S. § 3220 and the expansive language in *Dernham* which recognized the wife's capacity to obligate her separate property for her husband's debts as an incident of management and control of separate property in those situations in which she had management and control of her separate property and focused instead upon the narrowest language contained in that opinion. Furthermore, by referring to *Dernham* in *Baldwin,* the Court was also quoting from a case which had been decided under statutes unlike the statute under consideration in *Baldwin.* The statutes under consideration in *Dernham* had given married women the right to contract with respect to their separate property in very limited situations. Thus, to cite the passage from *Dernham* as authority in construing the newly enacted statute was to ignore the changes the legislature presumably intended to make by repealing the statute upon which *Dernham's* rule of pleading was based. It also ignored the language in *Dernham* that would indicate another rule of pleading and proof would be appropriate in circumstances where the wife had management and control of the separate property. Indeed, Justice Sullivan refused to join the two-man majority in *Baldwin* because he was "unable to concur in the conclusion that under the laws of this state a married woman cannot bind herself personally for the payment of a debt that was not con-

tracted for her own use, or for the use or benefit of her separate estate." 12 Idaho at 211, 85 P. at 499. Thus, although R.S. § 3220 provided that, "All persons are capable of contracting . . .", in the first case construing the statute expanding a married woman's right of management, control and disposition of her separate property, this Court held that she had not and could not obligate her separate property by entering into a contract, unless the contract was for her personal use or benefit or in connection with the use or benefit of her separate property. The Court reached this result even though the statute provided that a married woman could "enter into any contract with reference to the same, in the same manner, and to the same extent, and with like effect, as a married man may in relation to his real and personal property." I.C. 32–904.

Subsequent cases continued to construe the statute in the same manner as in the original *Baldwin* case. *Bank of Commerce, Ltd., v. Baldwin*, 14 Idaho 75, 93 P. 504 (1908); *Overland National Bank v. Halveston*, 33 Idaho 489, 196 P. 217 (1921); *Ness v. Coffer*, 42 Idaho 78, 244 P. 145 (1925). In *Loomis v. Gray*, 60 Idaho 193, 90 P.2d 529 (1939), a suit in which a creditor attempted to hold a married woman liable under the obligations of a promissory note which both she and her husband had signed, the Court said the following concerning the woman's liability upon the note and the creditor's right to recover his debt from her separate property:

"Furthermore, it is common knowledge that wives are not usually experienced in business, do not know what they may sign without making their separate property liable nor what they must not sign to avoid making it liable. Consequently, to require a wife to openly repudiate the acts of her husband in order to protect her property from liability for his unauthorized acts [using her separate funds and separate credit to further the community business] would make it necessary for the wife whenever her hus-band requested her to sign a paper . . . to closely interrogate him about the matter, and if still in doubt, to obtain legal advice. Such constant questioning would, no doubt, lead to misunderstandings, suspicion and turmoil, and thus largely destroy the peace and tranquility of the home which sound public policy would preserve. We, therefore, conclude the rule in *McLaren v. Hall*, [26 Iowa 297 (1869)], should be adopted and applied to the facts of this case." 60 Idaho at 210, 90 P.2d at 536.

The Court's reliance upon the *McLaren* case and its rule that,

"Neither good law nor sound reason will require the wife to destroy the peace of her family and endanger the married relation by open repudiation or hostile conduct toward her husband, in order to save her property from liability for his unauthorized contracts," 26 Iowa at 305,

seems particularly misplaced; first, because the legal rights and status of women had undergone a great change in the 70 years between the decision in *McLaren* in 1869 and the decision in *Loomis*; and secondly, because the Court in *McLaren* did not say that a woman could not bind herself and her separate property by her own acts. The Iowa court only said in that case that the husband had not been acting as her agent in the management of her separate property, that he had not bound her by his acts, and that she did not have to repudiate his unauthorized acts in order to prevent herself from being bound by them. Finally, in *Livingston v. Parish*, 81 Idaho 473, 346 P.2d 1047 (1959), and *Frost v. Mead*, 86 Idaho 155, 383 P.2d 834 (1963), the two cases in which this Court has most recently expressed its opinion upon this question, the Court has adhered to the views it had expressed in its previous opinions, observing in *Livingston* that,

"This Court has repeatedly held that in order to charge the separate property of a married woman or render it liable to levy and sale for an indebtedness contracted by her such allegations [that the

debt was incurred for her use and benefit or in reference with the management and control or for the use and benefit of her separate property] must be contained in the complaint and proven in the trial," 81 Idaho at 478, 346 P.2d at 1050,

and in *Frost* that,

" 'A married woman cannot bind herself personally for the payment of a debt that was not contracted for her own use or for the use and benefit of her separate estate, or in connection with the control and management thereof or in carrying on or conducting business therewith.' *Bank of Commerce, Ltd. v. Baldwin,* 12 Idaho 202, 85 P. 497, Syllabus 3." 86 Idaho at 163, 383 P.2d at 838.

Thus, with the exception of the language we have quoted from *Dernham,* and despite I.C. § 29–101's declaration that, "All persons are capable of contracting . . .", this Court has uniformly given the most restrictive interpretation to a married woman's right of "management, control and absolute power of disposition of her separate property" and her authority to "enter into any contract with reference to the same, in the same manner, and to the same extent, and with like effect, as a married man may in relation to his real and personal property . . . ."

*The liability of a married man's separate property for a community debt he has contracted.*

■ The proposition that under the law of Idaho a married man's separate property is liable for the satisfaction of judgments based upon his contractual obligations, whether the obligations be incurred for his separate benefit or the benefit of the community, has apparently been widely accepted by both the bench and bar of the state of Idaho. But the legislature has passed no law to that effect nor has this Court rendered any decision with such a holding. There is, however, a statute, I.C. § 11–201, which provides that a judgment debtor's property is subject to execution and which does not distinguish between the debtor's separate and community property or the separate community character of the debt, which thus suggests that there is no distinction between separate and community property in liability for a community debt. Nevertheless, despite the absence of direct authority upon this issue, Professor Brockelbank in his book, *The Community Property Law of Idaho* (1962), felt that this proposition was unquestioned. He said:

"It was taken for granted in *Holt v. Empey,* 32 Idaho 106, 178 Pac. 703 (1919), that the separate property of the husband would be liable for his debts—all his debts both antenuptual and postnuptual, and both community and separate. Such is also the understanding of Jacob, *The Law of Community Property in Idaho,* 1 Idaho L.J. 1 (1931)." Footnote 54, at 278.

However, after reviewing *Holt v. Empey,* we cannot agree that it stands for the sweeping proposition that "the separate property of the husband would be liable for his debts—all his debts . . . both community and separate." Thus, we feel that there has been no case law explicitly dealing with this question.

Conversely, however, in *Gustin v. Byam,* 41 Idaho 538, 240 P. 600 (1925), this Court said, "The community property is liable for the separate debts of the husband as well as for community debts." 41 Idaho at 545, 240 P. at 603. Thus, this Court has recognized no distinction between a husband's separate debt and a husband's community debt in stating that the community property is liable for the debt. We believe the bench and bar in this state have proceeded under the assumption that the analogous rule holds for his separate property, that the husband's separate property is liable for his debts whether they are separate or community debts. We recognize that this is not universally the rule throughout the community property states. For example, the Supreme Court of Arizona in the case of *Fox v. Weissbach,* 76 Ariz. 91, 259 P.2d

258 (1953), has stated, "[T]he separate property of a member of a community is not liable for the payment of a community obligation." 259 P.2d at 259. It has been generally assumed by Idaho's bench and bar that the husband's judgment creditor may look to both the husband's separate and community property for the satisfaction of a community debt, and because I.C. § 11–201 creates a statutory basis for this rule, we confirm that when a married man has entered into a contract for a community obligation, he has personally obligated himself under the contract, and his judgment creditor under the contract may execute upon his separate property for the satisfaction of a judgment against him. Having determined the law regarding the liability of a married man's separate property for any indebtedness he has incurred, we will now reassess our previous holdings concerning a married woman's separate property.

*Resolution of the issue.*

The underlying rationale for the line of cases we have discussed was that a married woman's capacity to contract and obligate her separate property must be restricted for her own "protection" to contracts for her own use and benefit or for the use or benefit of her separate property or in connection with the management of her separate property. I.C. § 32–904 was construed to this end despite I.C. § 29–101's mandate that, "All persons are capable of contracting." This Court indicated in *Loomis* that married women did not possess the acumen or competency to protect their separate property. Thus, their capacity to contract and thereby obligate their separate property must be severely restricted for their own benefit because a contrary holding would endanger domestic tranquility in circumstances in which a husband had requested his wife to become a party to agreements to which he was a party. We can no longer base our decisions on this rationale.

An unmarried woman has the same unlimited right to contract and the same unlimited liability for her contract as a married or unmarried man. By marrying, a woman has not become less capable of deciding whether she should enter into a contract, nor should her liability for debts which she has freely contracted be restricted so that her separate property will no longer be a source for the satisfaction of those debts. Thus, when the legislature passed I.C. § 32–904 providing that a married woman "may enter into any contract with reference to [her separate property] *in the same manner, and to the same extent, and with like effect,* as a married man may in relation to his real and personal property," the clear implication was that a married woman, like a married man, could and would obligate her separate property by any contract which she freely entered, not merely by those contracts for her own personal use or benefit or for the use or benefit of her separate property or in connection with the management and control of her separate property.

Nor do we believe that the legislature thought it necessary to enact a contrary rule to preserve the tranquility of the home. The legislature in 1913 S.L., ch. 105, p. 425 (the predecessor section to I.C. § 32–912), provided that the husband was without power to convey the community realty unless his wife joined in the instrument conveying the property, and thereby built into the law the same potential for creating domestic conflict that this Court in *Loomis* sought to avoid by its construction of the statute. Yet the rule requiring both the husband's and wife's signatures on any deed of community realty has been upheld since the earliest cases construing it were decided. *E. g., Myers v. Eby,* 33 Idaho 266, 193 P. 77 (1920); *Knudsen v. Lythman,* 33 Idaho 794, 200 P. 130 (1920). If, as the Court in *Loomis* thought, giving a married woman more complete rights and responsibilities over her separate property would inevitably endanger domestic tranquility, a proposition we do not find to be evident, nevertheless the legislature has decided to give married women those rights and re-

sponsibilities in other areas, and this Court should not continue to construe I.C. § 32–904 to effectuate a purpose which it then thought desirable, but which cannot be justified under the plain meaning of the language of the statute.

Finally, in construing this statute we are cognizant that in the past five years questions involving differing treatment of the rights and responsibilities of men and women have frequently taken constitutional dimension. In the landmark case of *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed. 2d 225 (1971), the Supreme Court of the United States said the following regarding a statutory classification which preferred male relatives over female relatives for the administration of decedents' estates:

"[W]e have concluded that the arbitrary preference established in favor of males by § 15–314 of the Idaho Code cannot stand in the face of the Fourteenth Amendment's command that no State deny the equal protection of the laws to any person within its jurisdiction.

. . . . . .

"The Equal Protection Clause of [the Fourteenth] amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' *Royster Guano Co. v. Virginia,* 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920). The question presented by this case, then, is whether a difference in the sex of competing applicants for letters of administration bears a rational relationship to a state objective that is sought to be advanced by the operation of §§ 15–312 and 15–314.

. . . . . .

"The crucial question, however, is whether § 15–314 advances [the objective of reducing the workload of the probate courts] in a manner consistent with the command of the Equal Protection Clause. We hold that it does not. To give a mandatory preference to members of either sex over members of the other, merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment; and whatever may be said as to the positive values of avoiding intrafamily controversy, the choice in this context may not lawfully be mandated solely on the basis of sex.

". . Regardless of their sex, persons within any one of the enumerated classes of that section are similarly situated with respect to [the objective of establishing degrees of entitlement to be an administrator by varying degrees of kinship with the intestate]. By providing dissimilar treatment for men and women who are thus similarly situated, the challenged section violates the Equal Protection Clause." 404 U.S. at 74–77, 92 S.Ct. at 253–254.

The apparent purpose of I.C. § 32–904 was to give married women the same contractual rights and responsibilities with respect to their separate property as those enjoyed by married men. By construing this statute in a manner which gave married men and women dissimilar rights and responsibilities with regard to that property, as our prior decisions have done, this Court has created and perpetuated arbitrary classifications of the kind criticized by the Supreme Court of the United States in *Reed v. Reed.* The prior construction of I.C. § 32–904 has not been based upon a reasonable interpretation of that section, and we recognize that adhering to our previous construction of the statute is of questionable constitutional validity.[1] *Suter v. Suter,* 97

1. By reaching our decision with reference to the requirements of the Fourteenth Amend- ment to the Constitution of the United States and construing the statute in question to

Idaho 461, 546 P.2d 1169 (1976); *Harrigfeld v. District Court,* 95 Idaho 540, 511 P.2d 822 (1973).

 We therefore hold that when a married woman has entered into a contract, whether the contract was made for her own use or benefit or for the use or benefit of her separate property, or otherwise, her judgment creditor under the contract may execute upon her separate property for the satisfaction of any judgment rendered against her.[2] Thus, we overrule *Frost v. Mead,* 86 Idaho 155, 383 P.2d 834 (1963); *Livingston v. Parish,* 81 Idaho 473, 346 P.2d 1047 (1959); *Loomis v. Gray,* 60 Idaho 193, 90 P.2d 529 (1939); *Ness v. Coffer,* 42 Idaho 78, 244 P. 145 (1925); *Overland National Bank v. Halveston,* 33 Idaho 489, 196 P. 217 (1921); *Meier & Frank Co. v. Bruce,* 30 Idaho 732, 168 P. 5 (1917); *Hall v. Johns,* 17 Idaho 224, 105 P. 71 (1909); *Bank of Commerce, Ltd., v. Baldwin,* 14 Idaho 75, 93 P. 504 (1908); and *Bank of Commerce, Ltd., v. Baldwin,* 12 Idaho 202,

85 P. 497 (1906); to the extent they are inconsistent with our opinion today, and observe that the case of *C. I. T. Corp. v. Sanderson,* 43 F.2d 985 (D.C.Idaho 1930), also contains language inconsistent with our opinion.

The cause is remanded to the district court to enter judgment for the defendant Paxton and deny Mary Williams' claim for attorney fees for prosecution of the action. Costs to appellant.

McFADDEN, C. J., DONALDSON and SHEPARD, JJ., and SCOGGIN, District Judge (Retired), concur.

## ON PETITION FOR REHEARING

### PER CURIAM:

The respondent Williams filed a petition for rehearing which was granted on June 18, 1976, and argued on December 1, 1976. A majority of the Court adheres to the views expressed in its prior opinion. *Cf.*

---

avoid constitutional challenges upon our construction of the statute, we have not explicitly reached the constitutional issue, although we arguably have implicitly done so. Therefore, we shall consider Williams' argument that the trial court's holding that because the constitutionality of I.C. § 32–904 was not placed at issue by the pleadings that neither the trial court nor this Court may consider that question. The trial court apparently considered unconstitutionality to be an affirmative defense which under I.R.C.P. 8(c) must have been pleaded in Paxton's answer in order to be considered by the court.

The Rules of Civil Procedure do not support this holding. Unconstitutionality is not listed as an affirmative defense under Rule 8(c). The defenses listed as affirmative defenses under that rule, such as assumption of risk or comparative negligence, generally are defenses in which the defendant has the burden of introducing evidence and persuading the finder of fact to establish the affirmative defense, or defenses such as statute of frauds or statute of limitations, which the plaintiff may defeat by the introduction of evidence of his own. The purpose of the rule requiring these defenses to be pleaded is to alert the parties concerning the issues of fact which will be tried and to afford them an opportunity to present evidence to meet those defenses. The constitutionality of a statute, however, is not ordinarily an issue upon which

evidence must be presented at trial or about which one must be forewarned in order to prepare evidence for trial. In this case the constitutional question is a matter of law. Thus, under I.R.C.P. 54(c), which provides that "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings," if the constitutional question can be determined without an evidentiary proceeding, the trial court must consider the issue of constitutionality at any stage of the proceedings in a non-jury trial. See 2A Moore's Federal Practice, ¶ 8.-27 [3, 4], pp. 1851–1862 (1975); *see* 5 Wright & Miller, Federal Practice & Procedure, § 1271, pp. 313–316 (1969), and fn. 64, *but see* fn. 29, pp. 307–308, *id.*

2. We emphasize that we are not considering the question of whether the separate property of a spouse who was not a party to a contract for the benefit of a community is subject to execution on a judgment for the community debt, and note that when the legislature amended I.C. § 32–912 to provide that the husband and the wife have equal rights to manage and control the community property, it provided that, "Any community obligation incurred by either the husband or the wife without the consent in writing of the other shall not obligate the separate property of the spouse who did not so consent."

*Booth Mercantile Co. v. Murphy*, 14 Idaho 212, 93 P. 777 (1908).

DONALDSON, Justice, dissenting.

Were we today deciding for the first time whether a married woman should be personally liable on all contracts she freely enters, I would agree with the majority that she should be. That, however, is not what I perceive to be the central issue here. The crux of this case is whether it is necessary at this late date to change a long-established rule of law to the detriment of those who have relied upon this Court's earlier decisions.

Before continuing, I believe it is necessary to identify clearly the rule of law which the majority changes. Beginning with *Dernham & Kaufmann v. Rowley*, 4 Idaho 753, 44 P. 643 (1896), this Court has consistently held that a married woman cannot become personally liable for a community debt.[1] Neither the *Dernham* decision, however, nor any subsequent decision, prevented a married woman from obligating her separate property for a community debt. This distinction was explained in *Bank of Commerce, Ltd. v. Baldwin*, 12 Idaho 202, 210, 85 P. 497, 499 (1906).

"In order to create a charge against her estate for such a debt [one not contracted for her use and benefit or that of her separate property], it must be made a charge *in rem* by a mortgage or pledge of the property or in some manner known to or recognized by the law as constituting a lien upon or charge against the specific property. * * * It has been repeatedly held that a married woman who signs a promissory note with her husband for the payment of his debt, and executes a mortgage on her property to secure the payment of the same, creates a liability only *in rem* and not *in personam*. The property encumbered is liable for the payment of the debt, but when exhausted the obligation, as against the wife, is extinguished, and no personal liability attaches."

Thus, a married woman was not prevented from obligating her separate property for a community debt. She was, however, limited in the manner in which she could do so.

The majority contends that when the legislature in 1903 enacted I.C. § 32–904, it intended to change the rule announced in *Dernham* thereby making married women personally liable upon all of their contracts. According to the majority, I.C. § 32–904 was misconstrued when first interpreted in *Bank of Commerce, Ltd. v. Baldwin, supra,* on subsequent appeal, 14 Idaho 75, 93 P. 504 (1908), and this misinterpretation was then followed by subsequent cases. The majority ignores the fact that, had the *Baldwin* decisions and those which followed failed to interpret I.C. § 32–904 in accord with the legislative intent, the legislature in over sixty-eight years took no action to correct the error. Furthermore, the majority bases its criticism of the early cases upon a misreading of those cases.[2] Irrespective of the reasons

[1.] Correctly stated, the rule is that a married woman cannot be personally liable for a debt not contracted for her use and benefit or that of her separate property. For the sake of clarity, I will refer to the rule as preventing a married woman from becoming personally liable for a community debt since that is the type of obligation involved in this case.

[2.] The majority begins by quoting from *Dernham & Kaufmann v. Rowley, supra.* They conclude that the *Dernham* court recognized that as to the separate property over which she had control, a married woman had the right "to pledge it for a debt of the husband or to voluntarily become a surety for his debt." If the majority means that the *Dernham* court recognized that a married woman could pledge her separate property for her husband's debt, they are correct. If they mean that she could obligate either herself or her separate property by agreeing to become a surety for his debt, they are incorrect. The married woman in that case co-signed with her husband a promissory note which was either a community debt or his separate debt. The court held that neither she nor her separate property was liable under the note. If she could incur liability by guaranteeing her husband's debts, she could certainly do so by co-signing a promissory note with him.

The majority then cites *Jaeckel v. Pease, supra,* to support its contention that "the

**166**

supporting the change, however, I believe the main issue to be the contracts to which the change should apply.

Court soon retreated from the statements con-, tained in *Dernham*." The holdings in both cases were identical. The wife, who joined with her husband in executing a promissory note, would not be personally liable, unless the debt was contracted by her for the use of her separate property, or for her own use and benefit.

The majority next attacks *Bank of Commerce, Ltd. v. Baldwin, supra,* the first case to construe I.C. § 32–904. The majority states that in construing the statute the *Baldwin* court "ignored both R.S. § 3220 [now codified as I.C. § 29–101] and the expansive language in *Dernham*." The majority also contends that the *Baldwin* court cited a passage from *Dernham* as authority in construing the newly-enacted statute thereby ignoring the changes presumably intended by the legislature.

First, the "expansive language" in *Dernham* is the result of the majority's misreading of that case. Second, although the *Baldwin* court may have "ignored" R.S. § 3220 in the sense that it did not discuss it, I doubt that the court was unaware of the statute. The *Dernham* court considered the statute and concluded that its purpose was not to give married women the right to make all contracts which may be made by a single woman. Finally, the *Baldwin* court did not cite *Dernham* as authority for construing the newly-enacted statute, thereby ignoring the legislative intent. Although the first *Baldwin* decision did not consider at length the legislative intent, the court did so in the subsequent appeal of that case. 14 Idaho 75, 93 P. 504 (1908). Prior to 1903 the husband generally had the right to manage and control his wife's separate property. R.S. §§ 2497 and 2498 (1887). The new statute gave the wife the right to manage and control her separate property, including the right to "enter into any contract with reference to the same," which right was coequal to that of a married man in dealing with his property. The issue as the court saw it was whether the legislature intended to merely transfer to the wife the right to manage and control her separate property, or whether it also intended to make her personally liable upon all of her contracts. After considering the meaning of the phrase "with reference to the same," the court concluded:

"It is evident to us that had the Legislature desired to change the rule as previously announced by this court, and grant the wife the right to become surety and guarantor and to sign accommodation paper and go bail, it would have done so in clear and unmistakable terms. In other words, the Legislature would not have limited her right to

The respondent signed the purchase contract in this case in 1968. Under the law which then existed, she personally, and

contract to those instances merely which have 'reference to her separate property.'" 14 Idaho at 82, 93 P. at 506–07.

The majority next criticizes *Loomis v. Gray,* 60 Idaho 193, 90 P.2d 529 (1939). They quote from *Loomis* and set out the rule announced in *McLaren v. Hall,* 26 Iowa 297 (1869). The majority then states that the *Loomis* court's reliance upon *McLaren* was misplaced

"because the Court in *McLaren* did not say that a woman could not bind herself and her separate property by her own acts. The Iowa court only said in that case that the husband had not been acting as her agent in the management of her separate property, that he had not bound her by his acts, and that she did not have to repudiate his unauthorized acts in order to prevent herself from being bound by them."

The *Loomis* court did not rely upon *McLaren* to support the rule that a married woman cannot become personally liable for a community debt. Both the statement by the *Loomis* court which the majority quotes and the court's reliance upon *McLaren* were in response to the creditor's argument "that by failing to speak or protest, appellant [the wife] is estopped to repudiate her husband's acts or to deny he acted for and as her agent." 60 Idaho at 210, 90 P.2d at 536. Thus, both the *Loomis* quotation and the reliance upon *McLaren* were to support the rule that a married woman had no duty to repudiate the unauthorized acts of her husband. They were not, as the majority implies, intended as support for the rule that she cannot become liable for community debts.

Finally the majority cites *Booth Mercantile Company v. Murphy,* 14 Idaho 212, 93 P. 777 (1908). I fail to see how that case could support the majority decision here. In *Booth* not only had the married woman executed a promissory note for her own use and benefit, but she had mortgaged her separate property as security for the note. The *Booth* court expressly stated that it

"does not depart from the well-recognized rule which has been adopted in this state, that, in order to charge the separate property of the wife, or render it liable to levy and sale, it must be alleged in the complaint and proven on the trial that the debt was incurred for the use and benefit of her separate property, or was a contract by her for her own use and benefit." 14 Idaho at 221, 93 P. at 779–80.

In the present case, the contract signed by respondent was a community obligation, and she did not execute a mortgage upon her home.

therefore her separate property, would not be liable under the contract. The majority now changes the law and applies it to respondent's contract. In doing so, it creates respondent's liability under the contract eight years after she signed it. I believe it is both unnecessary and unjust to apply the change in this manner.

As to contracts such as the present one, the legislature has acted to change the law. In 1974 it amended I.C. § 32–912 to give a married woman rights coequal with that of her husband in the management and control of the community property. The amendment also provided:

"any community obligation incurred by either the husband or the wife without the consent in writing of the other shall not obligate the separate property of the spouse who did not so consent."

The necessary implication of the amendment is that the separate property of a married woman will be obligated if she cosigns with her husband a contract for a community obligation after July 1, 1974, the effective date of the amendment.[3]

More importantly, however, I believe that any change in this law should apply prospectively only. The present case is an example of the inequity which will result from applying the change to existing contracts. Appellant knew prior to entering into this contract that respondent's husband had little or no assets of his own, and that the house in which respondent and her husband resided was her separate property. The transaction was for the benefit of the community and not for the benefit of respondent's separate property. She made no representation of any kind, false or otherwise, nor committed any acts which induced appellant to rely upon her credit for performance under the contract. In addition, respondent was not an active participant either in the negotiations for the transaction or in the management of the business. Respondent's only involvement in the entire transaction was her signing the contract because her husband "came home and told me I had to sign it."

Furthermore, had appellant desired to obtain security for the performance of respondent and her husband under the contract, he could have insisted that respondent execute a mortgage upon her house. None of the decisions of this Court would have prevented this, and respondent would have known that she was obligating her separate property for the community debt. Appellant did not so insist, however. Thus, in justifiable reliance upon eighty years of decisions from this Court, respondent signed the contract assuming that she personally, and therefore her separate property, would not be liable. Now, eight years later, the majority give appellant a windfall. They retroactively alter the contract by changing the law under which it is to be governed, thereby making respondent and her separate property liable.

In appropriate cases we have not hesitated to hold a married woman estopped to claim nonliability based upon her marital status. *Frost v. Mead*, 86 Idaho 155, 383 P.2d 834 (1963); *Overland Nat'l Bank v. Halveston*, 33 Idaho 489, 196 P. 217 (1921). Thus, the majority decision will change the result only in those cases in which estoppel would not apply—cases such as the present one in which the married woman's involvement in the transaction is minimal. Because of the inequity which will result from applying this change in the law to existing contracts, I would affirm the judgment of the district court.

BISTLINE, J., concurs in the dissent.

---

3. Although the amendment would cover the contract in this case, it is not as broad a change as that which the majority makes.

For example, it does not cover either oral contracts or those incurring non-community obligations.