383 P.2d 834

**George F. FROST and Helen Frost, Plaintiffs-Respondents,**

**v.**

**A. R. MEAD and Juanita Dixon Mead, now known as Juanita Dixon, Defendants-Appellants.**

No. 9244.

Supreme Court of Idaho.

July 19, 1963.

Milton E. Zener, Pocatello, for appellants.

Johnson & Olson, Pocatello, for respondents.

**158**

TAYLOR, Justice.

At the times involved plaintiffs (respondents) were husband and wife and defendants were husband and wife. Sometime prior to 1960 the four parties organized a corporation known as the Star Cab Company, and thereafter operated a cab business in Pocatello under that name. The plaintiffs were owners of 50% of the outstanding capital stock and the defendants were owners of the other 50%.

In May, 1960, plaintiffs sold their stock in the corporation to defendants for the sum of $3,000 and defendants executed and delivered to plaintiffs their promissory note, in that amount. On the note, the signature of Juanita Dixon Mead (appellant) appears first, and A. R. Mead, second. The note was payable $1,000 cash "on execution of this instrument" and $75 per month commencing July 1, 1960, with interest at 5%, and contained option to the holder to declare the entire amount due and payable upon default. The $1,000 down payment was made and an additional $225 of principal was paid on the note. Thereafter, upon default, plaintiffs declared the balance due and brought this action to recover thereon. In their complaint they alleged that the defendant, Juanita Dixon Mead, executed and delivered the note "for her own use and benefit or for the use and benefit of her separate property," and that the defendant, A. R. Mead, executed and delivered the note as "accommodation maker or endorser or guarantor." Default was entered against A. R. Mead.

Defendant Juanita Dixon Mead answered denying that the note was executed by her for her own use or benefit, or the use or benefit of her separate property, and alleged that the note was executed by her and A. R. Mead as co-makers; that, at the time, she and A. R. Mead were husband and wife; and that the note was given for a community obligation.

After trial to the court judgment was entered for plaintiffs, from which defendant Juanita Dixon Mead brought this appeal.

The assignments of error raise two issues, stated by appellant in her brief as follows:

"1. That the evidence shows it was a community obligation of Juanita

Dixon Mead and A. R. Mead and not a separate obligation of Juanita Dixon Mead.

"2. That there is no evidence to prove an estoppel against Juanita Dixon Mead to assert the defense that the obligation in question was a community one."

The record reveals substantially the following facts. In May, 1960, plaintiffs approached A. R. Mead; advised him that they could not continue on with the cab business; that it was failing and they wanted to sell their stock therein. Mead told them he had no money. Mead tried to borrow money, but was refused a loan by the bank for want of assets or credit. The plaintiffs then met with both A. R. Mead and Juanita Dixon Mead, on which occasion plaintiffs represented that they had invested $6,000 to $6,500 in the business, but would sell for $3,000. Juanita stated that she had confidence in her husband and believed that he could make the cab business pay, but she wanted time to consider plaintiff's offer. At a third meeting, the four parties being present, Juanita advised that the offer to sell for $3,000 was accepted. The attorney for the cab company and plaintiffs' attorney were then directed by the parties to conclude the transaction.

Juanita went to a bank, other than the one in which she regularly carried her account. There she gave a financial statement showing a net worth of $129,081.58. The bank made a loan to her of $3,000, which she deposited in her name, in the bank which made the loan. On this account she drew a check for $1,000, which was delivered to plaintiffs for the down payment required by the note in suit. The record does not show how or by whom the other $225 of principal was paid.

Plaintiff, Mrs. Frost, testified concerning the negotiations between the parties at the first meeting at which Juanita was present, as follows:

"A. Well, of course, we kept saying the same thing that it certainly was going under financially and we could not afford to put any more money into it, and we wanted to get out of the business, sell our share of the stock, and if we couldn't do that we would have to close the doors because we couldn't continue on the way we were, and in the discussion, why, Juanita said she had all the faith in the world in Art, that he could make a go of the cab company, so I turned to her and said, 'Well, if you have that much faith in your husband why don't you buy the shares of stock from us then?' So she asked for time to consider this personally then and decide whether she would buy our shares of stock, or not.

"Q. At that time was there anything said about the price of the stock?

"A. Well, we had,—I don't know whether we decided that evening or not on the price. We wanted to get out full amount of $6500.00 out of the price, but I think she said she would like to decide and wait until we met the next evening, or within the next two or three days,—I don't recall just how long a time we had on that.

"Q. Did she think it over?

"A. Yes.

"Q. What happened next?

"A. Well, we met then and she said she had,—* * * and Juanita said she had decided she would buy the shares of stock, but she wouldn't pay us that much. She said she would pay us the three thousand dollars, as we come to agreement on. * * *

"Q. Now, with regard to the sale of the stock, was the stock to be sold only to Juanita Dixon?

"A. That was our understanding, yes. Juanita is the only one who had any money to buy it.

"Q. I see. And that was your understanding?

"A. That is right.

"Q. That it was to be sold only to,—

"A. Art already had his half in it, and we figured she wanted the other part. * * *

"Q. * * * Mrs. Frost, whose choice, if anyone's, was it as to in whose name these stock certificates would be place___, if you know?

"A. No. I don't know of any choice. We just talked with Juanita because she was the one who had the money and could buy the stock, we just figured it would be her share of the stock. In other words, it would be complete ownership then if they took over. Art already had half of the shares, and we assumed she would take her half from the other part. That is just the way we felt about it, any way. * * * She said she had all the faith in the world in her husband making a go of the business. She felt he could do it; he was able to make that business pay."

Plaintiff George Frost testified:

"A. Well, we figured that Juanita was a pretty good business woman and she would give us some advice on what we could do, and she didn't come up with anything, because we wanted out of it; we couldn't go any further,— we felt we couldn't go any further with it, and so we wanted her advice on what to do, and she talked like she had all the confidence in the world for

Art, that he could continue on with the business, and so we just asked them why they couldn't take over our stock, and we would give them a price on it and let them have it.

"Q. Then,—go on.

"A. And so then that was left to decide between the two of them on what could be done; and we met,—I don't know whether it was the next day, but it was right suddenly, any way, and Juanita agreed to take our shares and turn them over to the Star Cab;"

and further: that at the first meeting with Juanita plaintiffs offered their stock for $3,000; and that at the second meeting with Juanita:

"Q. Now, what happened? What was said?

"A. Well, they had come to an agreement they would,—Juanita had come to the agreement she would take the three thousand dollars, and that went right from there to the lawyer's. * * *

"[Cross examination] Q. Mr. Mr. Frost, actually you didn't care to whom you sold this stock as long as the money was forthcoming; isn't that correct?

"A. Well, we felt the way Juanita felt towards Art that is where it should .

go; she had the money to take it over and that is the way it should go.

"A. But you didn't care whether you sold it to Juanita alone, or to Art and Juanita together, or just how?

"A. Well, Art was in no position to take it.

"Q. But as long as the money was forthcoming you didn't care whom you sold it to; is that right?

"A. Well, there was nobody else to sell it to. There were the four of us in there and Juanita could take care of it, and that is the way it went."

Juanita testified:

"A. Well, I can't recall the exact conversation this long after, but they did want to sell the stock and get out from under, and they wanted to put no more money into it, and it was discussed our buying the stock, but was never discussed as me buying it personally. * * * I can remember saying 'Give me time to think this over;'"

and also further testified that she knew Mr. Mead had no assets; that he had attempted to negotiate a loan with the bank prior to her application for a loan; that he had not been successful; that she borrowed the $3,000 on her own credit; that it was deposited in her name and she was the only one authorized to draw thereon; and that the entire amount was spent for the

benefit of the cab business, including the $1,000 paid on the note.

A. R. Mead testified that the plaintiffs asked him to buy them out; that he told them he had no money; that the agreement was that the Star Cab Company would purchase plaintiffs' stock, and—

"Q. Was Juanita Dixon Mead, was she to purchase the stock?

"A. No; she was only the secretary.

"Q. And now how did you carry this agreement out?

"A. We turned everything over to Oliver; he was our corporation attorney;"

and also testified that at the time it was his hope to continue with the cab business; that he had no assets nor credit; and that both the Frosts understood that he could not buy their share; that the agreement was the Star Cab Company would buy it; that after the deal Juanita gave her boy Gary ten shares, "because we had to have three people to make a corporation;" that Gary was Juanita's son and A. R. Mead's stepson; that of the shares, other than the shares issued to Gary, A. R. Mead held 50% and Juanita the other 50%.

An officer of the bank which made the loan to Juanita, testified that A. R. Mead applied for a loan first, but could not provide the necessary security; that later, upon Juanita's application, the loan was made to her on the basis of her financial statement.

The assignments on the back of the stock certificates, executed by the plaintiffs, were made to "A. R. Mead and Juanita Mead." A letter of resignation as officers and directors of the corporation was signed by plaintiffs, directed to A. R. Mead as president of the company, in which plaintiffs state they had sold and assigned their capital stock to "A. R. Mead and Juanita Mead."

The plaintiffs in their testimony explain that the assignments were prepared by the attorney for the cab company, and the letter by their own attorney; that they executed the instruments, as prepared, without question; that they left such formal details to the attorneys; that they assumed the transfers were made as Meads wanted them; and that they had advised their own attorney that they were selling to Juanita.

The Meads were divorced in June, 1961. "Several months" prior to the divorce Juanita transferred all of her stock in the cab company to her husband. She testified no money changed hands and he testified it was a gift. At the time of trial, May, 1962, A. R. Mead was a service station operator.

"During the continuance of the marriage, the wife has the management,

control and absolute power of disposition of her separate property, and may bargain, sell and convey her real and personal property, and may enter into any contract with reference to the same, in the same manner, and to the same extent, and with like effect, as a married man may in relation to his real and personal property: * * *." I.C. § 32-904.

A married woman may own and transfer stock in a business corporation, and may exercise all rights incident to such ownership, in the same manner as if she were unmarried. I.C. § 30-127.

"A married woman cannot bind herself personally for the payment of a debt that was not contracted for her own use or for the use and benefit of her separate estate, or in connection with the control and management thereof or in carrying on or conducting business therewith." Bank of Commerce, Ltd. v. Baldwin, 12 Idaho 202, 85 P. 497, Syllabus 3.

Loomis v. Gray, 60 Idaho 193, 90 P.2d 529; Ness v. Coffer, 42 Idaho 78, 244 P. 145; Overland National Bank of Boise v. Halveston, 33 Idaho 489, 196 P. 217; Bank of Commerce, Ltd. v. Baldwin, 14 Idaho 75, 93 P. 504, 17 L.R.A.,N.S., 676; Dernham & Kaufmann v. Rowley, 4 Idaho 753, 44 P. 643.

In the second Bank of Commerce, Ltd. v. Baldwin opinion this court said:

"If the promise is on her own account, if she or her separate estate receive a benefit, equity will lay hold of those circumstances, and compel her property to respond to the engagement. * * Originally at common law the wife had no separate estate and could not contract. Later, the English courts of chancery, through the medium of trusts, began to recognize and allow separate estates to be settled upon married women. Following the allowance of such estates, the Courts of Chancery, irrespective of the *feme covert's* incapacity to contract, held that, where the promise was made with reference to her separate estate, and she had signified an intention or desire to obligate her estate for a debt where the benefit or consideration moved to her or her estate, the Courts of Chancery would decree the payment of the same out of the separate estate." Bank of Commerce, Ltd. v. Baldwin, 14 Idaho 75, at 84 and 85, 93 P. 504, at 507.

On authority of the Baldwin case, this court, in Overland National Bank of Boise v. Halveston, 33 Idaho 489, 495, 196 P. 217, 219, said:

" * * * where property was parted with on the faith of her promise to pay, the contract would be a valid and

binding contract against her, but it would not be binding because it was a contract with reference to her property but because it is a contract to pay *her own debt* for her own use and benefit."

In the Overland National Bank case the doctrine of estoppel was held applicable to a married woman. The court said:

"She may during coverture receive, hold, use, and enjoy property of all kinds and the rents, issues, and profits thereof, and all avails of her contract and industry, free from the control of her husband. She is capable of making contracts by parol or under seal, and is bound by such contracts and responsible for her torts, and her separate property is liable for her debts and torts, to the same extent as *as* if she were unmarried. Married women cannot enjoy these enlarged rights of action and of property and remain irresponsible for the ordinary legal and equitable results of their contract. Incident to this power of married women to deal with others is the capacity to be bound and estopped by their conduct, and the enforcement of the principle of estoppel is necessary for the protection of those with whom they deal." Overland National Bank of Boise v. Halveston, 33 Idaho 489, 500, 196 P. 217, 221.

In Grice v. Woodworth, 10 Idaho 459, 80 P. 912, 69 L.R.A. 584, this court held that where a husband and wife make an oral contract to sell their homestead, and where the purchaser takes possession, pays the purchase price, and makes valuable improvements thereon, all with the knowledge and consent of the wife, she is estopped to deny the validity of the contract on the ground of her disability. The court quoted from Pomeroy's Equity Jurisprudence as follows:

"'* * * The tendency of modern authority, however, is strongly toward the enforcement of the estoppel against married women, as against persons *sui juris*, with little or no limitation on account of their disability. This is plainly so in states where the legislation has freed their property from all interest or control of their husbands, and has clothed them with partial or complete capacity to deal with it as though they were single. Even independently of this legislation there is a decided preponderance of authority sustaining the estoppel against her, either when she is attempting to enforce an alleged right or to maintain a defense.'" 10 Idaho at 466, 80 P. at 914.

And further said:

"While the provisions of the sections above quoted were made for the pro-

tection of married women, they were not intended to operate as a shield to relieve them against a fraudulent transaction such as the one under consideration, and she is estopped by her own acts from interposing the provision of said sections as a valid defense to this action." 10 Idaho at 468, 80 P. at 915. Estoppel was invoked against married women in the following cases: Buhl State Bank v. Glander, 56 Idaho 543, 56 P.2d 757; Kansas City Life Ins. Co. v. Harroun, 44 Idaho 643, 258 P. 929; Leaf v. Codd, 41 Idaho 547, 240 P. 593, Boise Butcher Co., Ltd. v. Anixdale, 26 Idaho 483, 144 P. 337.

In this case both of the propositions urged by defendant (appellant) must be resolved against her. She dealt with plaintiffs sui juris. She knew that her husband had no money, property or credit. The trial court found that the parties had no community property. She thought, but was not sure, that she and her husband held some stock in the cab company "in both of our names." If her intent was to refer to it as community property, it is apparent from the record that it was not sufficient in value to enable the community, or the cab company, to purchase plaintiffs' stock. The company was in a failing financial condition and no such transaction (as claimed by her husband) could have been entered into on its behalf without impairment of its capital. In her testimony Juanita said she and her husband were buying plaintiffs' stock, but she did not indicate that either her husband or the community had any money or property available for that purpose. She knew that the plaintiffs were looking to her for payment of the agreed price, because there was no other source for such payment, and she knew the plaintiffs had no confidence in the prospects of the cab company.

Under the circumstances, the money she borrowed for the purpose of entering into this transaction, and the thousand dollars which she paid on the note, was her separate property. Shovlain v. Shovlain, 78 Idaho 399, 305 P.2d 737. Her testimony, together with that of her husband, indicates that she received most of the stock transferred by plaintiffs. Whether she intended to go into the cab business with her husband or to set him up in that business by way of a gift of the stock is immaterial. She was free to do with her separate property as she pleased.

We conclude that she made, and intended to make, the transaction in her own right; that her conduct led the plaintiffs to rely upon her agreement to purchase and pay for their stock; and that they were justified in so doing. Therefore, the obligation represented by the note was her individual and separate obligation and her separate property was liable for the payment thereof. I.C. § 32–911. The facts also support the finding and conclusion that she was es-

topped to claim non-liability because of her marital status.

Defendant urges that estoppel should not have been invoked, or found, by the trial court because it was not specially pleaded. No objection upon that ground was made either to the evidence or to the findings or conclusions. Defendant does not contend that she was misled to her prejudice upon trial because of the failure of plaintiffs to plead estoppel in specific terms. A party cannot complain of variance between pleading and proof in the absence of a showing that he was misled thereby to his prejudice. IRCP 15(b); Wurm v. Pulice, 82 Idaho 359, 353 P.2d 1071; Abel v. Brayton Flying Service (5th Cir.) 248 F.2d 713; Ernst v. General Refractories Co. (6th Cir.) 202 F.2d 485; American Fork & Hoe Co. v. Stampit Corp. (6th Cir.) 125 F.2d 472.

Issues not raised in the trial court will not be considered by this court on appeal, and the parties will be held to the theory upon which the cause was tried in the lower court. Smith v. Shinn, 82 Idaho 141, 150, 350 P.2d 348. See cases there cited.

Judgment affirmed.

Costs to respondents.

KNUDSON, C. J., and McQUADE, McFADDEN and SMITH, JJ., concur.