740 P.2d 43

**Dorothy Mae PRESNELL,
Claimant-Appellant,**

v.

**Lucy KELLY, dba/Lynwood
Norge, Employer,**

and

**United States Fidelity & Guaranty Company, Surety, Defendants-Respondents.**

No. 16527.

Supreme Court of Idaho.

June 23, 1987.

Emil F. Pike, Twin Falls, for claimant-appellant.

John W. Barrett, Moffatt, Thomas, Barrett & Blanton, Boise, for defendants-respondents.

HUNTLEY, Justice.

On December 26, 1979, Dorothy Mae Presnell was removing solvent-soaked clothing from a washing machine, which had mechanically failed, when she felt a sharp pain in her back radiating down her leg and suffered a disc herniation at the L5–6 level. Mrs. Presnell was employed by Lynwood Norge Cleaning to operate dry cleaning machines, mop floors and clean the washers and dryers.

After the injury, Presnell underwent a laminectomy for a protruded disc. In the course of surgery, a blood vessel was accidentally severed and later repaired. Presnell filed a malpractice claim against the doctor involved and settled that third-party proceeding, netting $4,534.13 after deduction of expenses and attorney fees. The surety, United States Fidelity & Guaranty Company paid all of Presnell's medical expenses incurred relative to the repair of the damage caused by the alleged malpractice and did not waive any right of subrogation for the amount paid to repair the artery.

Since the accident, Presnell has suffered from low back pain and bilateral leg pain, particularly in the left leg. Presnell has not sought employment since the accident occurred, having stated to Doctors Holt and Wilson that she would lose her worker's compensation benefits if she found a job.

Presnell contends that she is at least 50% permanently disabled, which entitles her to permanent partial disability benefits due to decreased earning capacity. The Industrial Commission found that Presnell suffered a permanent partial disability of 15% of the whole man (including a permanent physical impairment of 7½% of the whole man) as a result of her injuries. The commission further ordered that the award be reduced by $4,543.13, the amount received by Presnell pursuant to recovery from the malpractice suit.

Presnell argues that surety United States Fidelity & Guarantee Company has no right of subrogation to that extent and argues that the commission did not adequately consider pain as a factor in her permanent disability rating.

The Industrial Commission based its impairment and disability ratings, in part, upon the testimony of Dr. Richard Wilson, a neurologist. The commission also relied upon the testimony of Dr. William Tregoning, an orthopedic surgeon, Dr. Stephen Asher, a neurologist, and Dr. Eric Holt, a psychiatrist. In addition, the commission considered the testimony of two rehabilitation experts, David Brower and William S. Bronson.

We first address the issue of whether there exists substantial, competent evidence to support the Industrial Commission's finding that Presnell is entitled to a permanent partial disability rating of 15% of the whole man.

Appellate review of Industrial Commission orders is limited. The findings of the commission will be upheld if supported by substantial, competent evidence. In *Case of Graham*, 103 Idaho 824, 825–26, 654 P.2d 1377, 1378–79 (1982), this Court held:

> Appellate review of findings of fact made by the Industrial Commission is

limited in scope. Idaho Const. art. 5, § 9; I.C. §§ 72–724, –732; *Gordon v. West*, 103 Idaho 100, 103, 645 P.2d 334, 337 (1982); *Curtis v. Shoshone County Sheriff's Office*, 102 Idaho 300, 303, 629 P.2d 696, 699 (1981); *Sykes v. C.P. Clare & Co.*, 100 Idaho 761, 605 P.2d 939 (1980); *Paulson v. Idaho Forest Industries, Inc.*, 99 Idaho 896, 591 P.2d 143 (1979). This review does not entail a de novo determination of fact. I.C. § 72–732. We are not concerned with whether this Court would have reached the same conclusion, but rather, with whether the findings by the commissions are supported by substantial, competent evidence. (Citations omitted).

Dr. Wilson's initial examination showed evidence of an injury to the L5 nerve root, affecting Presnell's left leg. An EMG conducted in May 1980 showed sub-acute left L5 radiculopathy. Wilson believed that Presnell was stable by July 1981. He found a normal range of motion of the lumbar spine and no definite abnormality on sensory testing. He also found that Presnell's reflexes were normal and that the results of the neurological examination were objectively normal. Wilson also testified that Presnell's pain was a reflection of stress and exaggerated by the claimant's personality. He estimated the claimant's permanent impairment at 10% of the whole man.

In August 1983, Presnell was evaluated by a panel of physicians, which consisted of Dr. William R. Tregoning, Dr. Stephen Asher and Dr. Eric Holt. Dr. Tregoning presented testimony that Presnell's complaints of pain were not supported by objective medical findings. He further testified that Presnell had the capacity to work either at Lynwood Norge or in a convenience store, and he would have given Presnell a permanent physical impairment rating of 5% of the whole man. Dr. Holt noted that Presnell appeared agile and quick in her movements and that this agility evidenced a lack of pain.

Dr. William S. Bronson, a psychologist with experience in the field of rehabilitation, admitted that there was no medical

evidence to support Presnell's complaint that she had limited use of her left arm and left foot. In addition, Dr. Bronson acknowledged that he could find no medical restrictions of Presnell's ability to walk, stand, sit, run, climb, push or pull. Dr. Bronson listed several jobs which Presnell was capable of performing after her injury: ward clerk, parking lot attendant, record clerk, telephone operator, proofreader, cashier, and sorter.

Presnell argues that the commission failed to consider her pain as a factor in determining the permanent physical disability rating. However, pain is specifically referred to in the commission's findings. In addition, Dr. Wilson and Dr. Holt indicated that Presnell seemed to be exaggerating her complaints of pain. This Court has held that the amount of disability to be attributed to the factor of pain is a determination for the Industrial Commission when arriving at a permanent disability rating. In *Knapp v. Brotherton's, Inc.*, 102 Idaho 403, 404, 630 P.2d 690, 691 (1981), the claimant, as in the instant action, contended that the commission had not given sufficient consideration to the factor of pain in making its award of disability. The court, however, noted that the medical experts indicated that the claimant suffered mild to moderate pain and that they had considered the factor of pain when they rated her disability:

> The commission found that claimant-appellant suffered mild to moderate pain and considered the factor of pain in their determination of disability. Those findings, which as to both form and content are commendable, are supported by substantial and competent evidence and in turn support to the award to claimant-appellant of a partial permanent disability of 20% of the whole person. Hence, they will not be disturbed on appeal. (Citations omitted).

The 15% rating by the commission is supported by substantial and competent ev-idence and is, in fact, higher than the figures offered by Doctors Tregoning and Wilson. Hence, there is no basis upon which to overturn the Industrial Commission decision rating Presnell's disability at 15% of the whole person and its finding in that regard is affirmed.

We next address whether the Industrial Commission erred in ordering an offset of $4,534.13 of Presnell's total award of $7,961.25 to the defendants pursuant to I.C. § 72–223 for payments made for Presnell's medical expenses incurred due to medical malpractice.[1]

Subrogation is the substitution of one person in the place of another with reference to a legal right. *City of New York Ins. Co. v. Tice*, 152 P.2d 836, 839 (Kan.1944). Black's Law Dictionary defines subrogation as "The right of one who has paid an obligation which another should have paid to be indemnified by the other." Black's Law Dictionary 1279 (5th ed. 1979). Subrogation for third party liability is known as legal subrogation. The purpose of legal subrogation is to work out an equitable adjustment between parties by assuring that the discharge of an obligation be paid by the person who in equity and good conscience ought to pay it. *Id.* at 839. *Memphis and L.R.R. Co. v. Dow*, 120 U.S. 287, 7 S.Ct. 482, 30 L.Ed. 595 (1887). An additional purpose of subrogation for third party liability is to prevent the injured claimant from obtaining a double recovery for an injury. *Schneider v. Farmers Merchant, Inc.*, 106 Idaho 241, 245, 678 P.2d 33, 37 (1983).

During surgery, Presnell suffered a negligent cutting of the iliac artery, and this required immediate corrective surgery. The record is devoid of any finding by the commission as to the amount, if any, that the surety paid relative to the surgery for repair of the iliac artery, although the briefing of the parties assumes that the

---

1. Under I.C. § 72–223(3), the surety is entitled to be subrogated *for expenses paid:*

 . . . .

 (3) If compensation has been claimed and awarded, the employer *having paid such com-* *pensation* or having become liable therefor, shall be subrogated to the rights of the employee, to recover against such third party to the extent of the employer's compensation liability. (Emphasis supplied.)

surety paid for the second surgery. Likewise, no part of the 15% disability rating was attributable to the cutting of the artery.

The surety argues it should receive the entire $10,000, less attorney fees, but cites no authority for the proposition. If the surety were given the requested amount, it would be nothing but a windfall to the surety based upon trauma to Presnell's body.

In fact, the colloquy of counsel before the commission indicates they did not understand or argue that the surety should participate in any windfall for the medical malpractice recovery above that paid out to repair the damage to the iliac artery or compensate for extended care necessitated by that repair. In stipulating that the surety had paid out on this case at least the sum of $4,534.13 netted by Mrs. Presnell from the malpractice case, counsel stated:

MR. BARRETT: And that they have paid any extended income benefits resulting from that procedure included in the payments that they have made?

MR. PIKE: Here is what I don't know: I have not seen the figures as to how much the surety has paid with reference to the additional medical procedure that was required. I have not been furnished that information. And I also do not know how much actual extension of care this lady needed because of the alleged malpractice of Dr. [John Doe]. If I could have that information perhaps then I could enter into a stipulation.

 Since the record is devoid of any findings or testimony as to the medical expense incurred for the iliac repair and convalescence, the order of the commission is reversed and remanded for further proceedings to determine the surety's subrogation rights as to expenditures made as a result of the cutting of the artery, with recovery from the malpractice settlement in excess of the surety's expenditures in connection therewith to remain in the appellant.

Costs to appellant. No attorney fees awarded.

SHEPARD, C.J., and DONALDSON, J., concur.

BAKES, Justice, concurring in part and dissenting in part:

I concur with all of the majority opinion except that part which reverses and remands for a commission determination of the amount of money paid to correct the malpractice committed by Dr. Howar. That issue was never raised by the appellant on appeal, nor was it raised in the commission below.

The Industrial Commission, in its opinion, states, "The only issue before the commission is the extent of the permanent disability, if any, which resulted from the claimant's accident of December 26, 1979." After the commission's decision, the claimant filed a petition for reconsideration with the commission. The petitioner requested the commission to reconsider its 15% disability rating, renewing her argument that claimant was totally disabled. The petition further argued against the commission's order allowing subrogation, stating that "the net settlement of $4,543.13 fails to even compensate Mrs. Presnell for the pain, suffering and discomfort resulting from said alleged malpractice," and "under such circumstances, it is herein respectfully urged that claimant has, in fact, not made a [double] recovery as against a third party from which the employer herein should be entitled to subrogation rights." The petition did not allege or assert that the amount of medical expenses had not been proven to exceed the $4,534.13 figure.

On appeal to this Court the sole issue raised in the appellant's brief was the issue of whether or not the commission had fully compensated the claimant for permanent partial disability by its 15% of the whole man award.[1] No issue was raised, nor was

1. The appellant's brief states the sole issue to be as follows:

"ISSUES PRESENTED ON APPEAL
"The issue on appeal in these proceedings is whether the Industrial Commission erred in its Findings of Fact and Conclusions of Law in that the same failed to indicate the testimony

any argument made in appellant's brief concerning the surety's right to subrogation or the amount thereof. The entire argument was directed toward the inadequacy of the commission's 15% disability rating. Our cases are legion that issues not raised before the lower tribunal, or on appeal, will not be considered by this Court. *See Robinson v. Spicer*, 86 Idaho 138, 383 P.2d 844 (1963); *Frost v. Mead*, 86 Idaho 155, 383 P.2d 834 (1963) (holding that issues not raised below cannot be presented on appeal). Thus, I believe the Court errs today when it reverses on an issue which was never disputed before the Industrial Commission and has not been raised on appeal here.

Since the amount of medical expenses paid by the surety to correct the damaged artery was never an issue below, it is not surprising that the commission's findings and the record do not specifically address that issue. Nevertheless, I believe the record is adequate to support the commission's decision that the expenses paid by the surety as the result of the damaged artery exceeded the $4,534.13[2] remaining from the malpractice recovery after payment of costs and fees.

It would certainly be preferable in administrative proceedings, or any trial for that matter, if every factual issue which is raised was clearly and expressly resolved by evidence in the record, leaving nothing to inference. However, that is not always the case. And if the issue was never raised before the trial court or commission, it is seldom the case. Even when raised, trial courts and juries are often required to make findings based on inferences. In this case, construing the record and all reasonable inferences therefrom in favor of the party who prevailed below, as our prior cases say we must, *Hazen v. General Store*, 111 Idaho 972, 729 P.2d 1035 (1986); *Higginson v. Westergard*, 100 Idaho 687, 604 P.2d 51 (1979), I believe that, even if

the issue had been raised on appeal, the record is adequate to support the commission's findings.

By narrowly focusing on a single sentence in the stipulation colloquy of counsel, the majority misinterprets what occurred. The majority opinion says there was no stipulation or understanding as to the amount of the medical expenses, and thus nothing to support the commission's decision, relying upon the following sentence:

"MR. PIKE: Here is what I don't know: I have not seen the figures as to how much the surety has paid with reference to the additional medical procedure that was required."

From that, the majority concludes that the issue of the amount of medical expenses attributable to the malpractice is unresolved in the record and remands for additional evidence and findings on that issue. However, if the entire colloquy is examined, it is apparent that the narrow response by Mr. Pike, focused on by the majority opinion, was not addressed to the issue of the amount of medical expenses, but was referring to "extended income benefits." That is evident from an examination of the entire colloquy:

"MR. BARRETT: Also, if we might, preliminarily, Your Honor, we would offer a stipulation with Counsel that there has been third party proceedings in regard to this matter, a claim made by the claimant against, I believe it was, Dr. Howar. Is that correct?

"MR. PIKE: That's correct.

"MR. BARRETT: For malpractice in conjunction with surgery which was performed upon her in the form of a laminectomy following this accident, and that the claimant has realized a net recovery of—that is, a recovery to her above and beyond attorney fees and costs in the amount of $4500.

"We would offer a stipulation that upon any recovery the claimant may make in these proceedings that there would be an

---

adopted by the Commission and the reasoning the Commission used in reaching its conclusions. Further, the Industrial Commission failed to fully compensate the claimant for per-

manent partial disability pursuant to Idaho Code 72–423."

2. This figure is sometimes transposed in the record as $4,543.13.

offset for a credit to the surety in that amount; that is, the net recovery only, the $4500.

"MR. PIKE: Mr. Geddes, what Mr. Barrett says is correct as far as the amount that is recovered, the net to the client. That is a correct figure. As to whether or not I would stipulate that the surety is entitled to an offset, I am not prepared to do that.

"MR. BARRETT: Your Honor, may I inquire as to what the issue may be in regard to that so that we will know in what manner we are to proceed? *In other words, do you agree that the surety has paid all of the medical expenses that were incurred relative to the repair of the damage that was caused by the malpractice?*

"MR. PIKE: *Yes, I would stipulate to that.*

"MR. BARRETT: And that they have paid *any extended income benefits* resulting from that procedure included in the payments that they have made?

"MR. PIKE: *Here is what I don't know:* I have not seen the figures as to how much the surety has paid with reference to the additional medical procedure that was required. I have not been furnished that information. And I also do not know how much actual extension of care this lady needed because of the alleged malpractice of Dr. Howar. If I could have that information, perhaps then I could enter into a stipulation." (Emphasis added.)

A careful reading of the entire colloquy reflects that the portion of the discussion quoted in the majority opinion reflects that the discussion was not about medical expenses at all, but about "extended income benefits." Previous to the hearing the surety had paid temporary benefits based upon the surety's evaluation of a 10% impairment rating. The claimant was contending total disability, and the commission ultimately found 15% disability which resulted in additional benefits to the claimant over the amount of temporary benefits previously paid for the 10% impairment. That is clearly pointed out in the deposition of

Eugene Kirkpatrick from the following questions and answers.

"Q. All right. So do I understand that if there would be no recovery by Mrs. Presnell in the Worker's Compensation case over and above what she had received to date, that is, the 10 percent rating, that USF & G would not make a claim back against Mrs. Presnell worth $4,500?

"A. We would not attempt to get any recovery from what we have paid to—

"Q. Well, let us assume in the Presnell case that she recovered an additional $5,000 over and above what she's been paid because of 'disability over and above the impairment.'

"*What was your understanding of what would be the result insofar as the 4,500 subrogated interest is concerned?*

"A. *That we would be able to take credit for our subrogated interest against anybody that we might have to pay subject to a negotiated amount.*

"Q. Did you at any time agree with Mr. Pike or Mr. Bithell to waive your subrogated interest?

"A. No." (Emphasis added.)

The issue upon which the majority opinion reverses was not really questioned or in doubt in the proceedings below. In Defendant's Posthearing Memorandum Brief before the Industrial Commission, page 19, the following is found:

"In this case, the claimant has recovered a net of $4,500 from a recovery of $10,000 in the third party malpractice claim against Dr. Howar, orthopedic surgeon, who performed the surgery in this case. The amount has been stipulated to by the parties. The parties have also stipulated that the amounts paid by the surety in this case relative to the malpractice claim exceed $4,500."

Further, in Defendants' Reply Brief to Claimant's Brief in Support of Motion for Reconsideration, page 2, the following is stated:

"The second point raised in claimant's motion for reconsideration is that the defendant surety is not entitled to an offset for amounts paid by the surety for

medical expenses incurred through the alleged malpractice of Dr. Howar, orthopedic surgeon. Included in the record before the Industrial Commission is a stipulation by the parties that the amount in question ($4,543.13) is the amount paid by the surety for medical expenses incurred by the claimant as a result of the alleged malpractice of Dr. Howar."

Continuing on page 15 of the reply brief: "In this case, the claimant's net recovery in the third party malpractice action was less than the amounts required to be paid by the surety due to the alleged malpractice of Dr. Howar. Thus, in accordance with the foregoing decisions, the surety is most certainly entitled to the full offset given the fact that the surety paid in excess of what the claimant received by way of net recovery in the third party proceedings."

Finally, in respondent's brief on appeal in this Court, page 42, the respondent restates, verbatim, the quote immediately above, from page 15 of its earlier brief. Then, continuing on page 45, is this statement:

"On the issue of right of subrogation under the provisions of I.C. § 72–223, it should be noted that the amount expended by the surety due to the alleged malpractice of Dr. Howar was stipulated and agreed upon by the parties. It should further be noted that the parties agreed that these amounts were paid by the surety."

Plaintiff never denies in any of its briefs, or anywhere else, the defendants' statements as to the actual amount expended. Plaintiff's only response was that quoted in the majority opinion, *ante* at 4, 740 P.2d 46, relating to "extended income benefits," and not medical expenses.

Accordingly, I believe the record is adequate to support the commission's findings, assuming that the issue of the amount of medical expenses paid had been raised both in the commission and on appeal. However, it was not raised in either, and therefore the commission's order should be affirmed in its entirety.

BISTLINE, Justice, concurring in part, dissenting in part.

As is sometimes my wont, I obtained a copy of the entire file from the clerk's office and initiated an opinion of my own for reasons which appear below in short order. It is gratifying to have a majority of the Court reach the same conclusion that there is something amiss in the Commission's outright award of Mrs. Presnell's net return on the malpractice claim to her employer's surety, USF & G. I concur in reversing that award, but do not agree with the directions on remand.

Had I never attended law school, and had I never practiced law in the field of workmen's compensation law, and had I not participated in appellate review of the many cases appealed from the Industrial Commission, or, in short, were I wholly uninformed on the subject, logic and common sense would tell me that we would be perpetrating a gross miscarriage of justice on Mrs. Presnell if we upheld the Industrial Commission's taking away from her the sum of $4,500 plus.

What this case is *not* is a replay of *Tucker v. Union Oil Co.*, 100 Idaho 590, 603 P.2d 156 (1979). Tucker, an employee of Feed Services (a non-party to the litigation), was severely injured in an industrial accident and had received compensation benefits and also past and future medical expenses from his employer's surety. Tucker and his wife brought a tort damage action for the personal injuries suffered. The jury affixed causative negligence to Tucker at 10 percent, to his employer at 30 percent, and to Carbon Collier at 60 percent. Damages were set at $350,000 to Tucker, and $12,000 to his wife. A final judgment was entered against Carbon Collier in the sum of $325,000. The trial court, the Honorable Edward J. Lodge, denied Carbon Collier's motion to reduce the judgment by the amount that had been paid Tucker in workmen's compensation benefits. This Court, not bothering to specifically overrule *Liberty Mutual Ins. Co. v. Adams*, 91 Idaho 151, 417 P.2d 417 (1981), adopted some of the reasoning of a Califor-

nia court and held that "Carbon Collier is entitled to have the judgment against it reduced by the amount of workmen's compensation benefits paid to Tucker." 100 Idaho at 604, 417 P.2d at 170.[1] This Court did not in turn, so far as I know and understand it, then in turn reimburse Tucker's employer/surety in the amount of that reduction.

Boiled down, the essence of the *Tucker* holding was that it centered on a single industrial accident—*one* happening where there was *employer* negligence (independent of the vicarious liability for employee negligence) as well as contributing third party negligence, *i.e.*, that of Carbon Collier. While I was adamantly opposed to the holding that a workmen's compensation award would be a deductible item from any third-party recovery, nevertheless, on the basis of giving *stare decisis* effect to *Tucker*, and no constitutional issue being involved, I joined the majority opinion in *Schneider v. Farmers Merchant, Inc.*, 106 Idaho 241, 678 P.2d 33 (1983), as witnessed by my special concurrence, 106 Idaho at 246, 678 P.2d at 38. That case, too, was in a context similar to *Tucker, i.e., one* industrial injury.

*Tucker* is, however, wholly inapplicable to this case. Here, we again have a single happening, but in this instance, the single happening is an industrial injury which involves no contention of employee negligence (which of course is impermissibly irrelevant), no contention of third-party negligence in the occurrence, and in turn, no contention of an independent employer negligence. The provisions of I.C. § 72-223 have no applicability. That statute is clear. The third-party liability there discussed comes into play only "when *the injury* ... is caused under circumstances creating in some person other than the employer a legal liability to pay damages therefor, such person so liable being referred to as the third party...." § 72-223(1), Vol. 11A, Idaho Code, p. 109 (emphasis added).

In Mrs. Presnell's case, the only industrial injury which she suffered, concerning which there is no doubt nor dispute, was a herniated disc suffered while she was at work on employer's premises—occasioned suddenly at a precise time when she was doing some heavy lifting after a dry cleaning machine failed mechanically. The surety has never disputed the occurrence of an industrial injury. It has only resisted Mrs. Presnell on the matter of physical impairment and disability, and affirmatively it successfully took away the $4,500 which she netted as a result of another later incident which did not occur at her work or on her employer's premises.

Her herniated disc was so readily pronounced that she had laminectomy surgery less than two weeks later—which is rather expeditious scheduling when it is taken into account that this was all during the 1979 Christmas and ensuing New Year's holidays.

All of the compensation benefits awarded to Mrs. Presnell flowed directly from the residual disability following repair of the herniated disc laminectomy. She was at the time 56 years of age, and according to the neurologist, Dr. Wilson, beset with nagging, fairly constant, largely nonradiating low back pain. Coupled with the back pain was "bilateral leg pain, worse on the left." The surety's brief nicely summarizes the findings and conclusions of the various doctors who either treated her and/or evaluated her. Not one of those doctors pointed to any residual impairment resulting from the successful repair to the severed artery—likewise with the decision of the Commission.

A Commission finding, No. II, accurately provides the factual circumstance which in turn misled the Commission to docking from Mrs. Presnell's moderate award for back impairment and disability the aforesaid sum of $4,500:

A complication occurred during the surgery [to repair a herniated disc], resulting in arterial bleeding, and a second

---

1. For an assessment of the validity of the windfall which Judge Lodge did *not* give to Carbon Collier, see the dissenting opinion which would have affirmed Judge Lodge. 100 Idaho at 605, 603 P.2d at 171.

surgical procedure was performed the same day to repair an artery. R., p. 64. A close reading of the record makes it abundantly clear that the repair to the artery was successful, and that that surgical mishap was not any factor in Mrs. Presnell's recovery from the disc surgery, or in the evaluations by the various doctors of Mrs. Presnell's impairment. It was without doubt a terrifying experience, not only for the surgeons, but for Mrs. Presnell. It was described by her counsel, with medical records before him, as "a negligent cutting of one of her great vessels (the iliac artery), in the retroperitoneal area." It required immediate surgery, and immediate surgery was performed, which involved another specialist.

The final finding of the Commission, and one which certainly should have alerted the attention of any trained legal mind, is this:

## IX

Prior to the hearing the Claimant had made a malpractice claim against Dr. [John Doe] and had received a total settlement on her claim in the amount of $10,000. The Claimant's net recovery, after costs and attorney fees, amounted to $4,543.13. The Surety and Claimant's attorney in her malpractice action had an understanding that the Surety would not exercise its subrogation rights against any of the $10,000 recovery based upon compensation which had been paid to that time. However, it was understood that should the Claimant recover any additional compensation for permanent disability and non-medical factors, the Surety would not waive its subrogation rights with respect to such future recovery. (Emphasis added.)

The underscoring above is mine. Anytime an attorney hears a witness testify that something was "understood," first of all it will be seen as a conclusion, and not a statement of any evidence. Second of all, the attorney will want to know who obtained the understanding and from whom. Thirdly, it will be insisted that the witness testify as to what was written or what was said, and from which the understanding

was gathered. Here, the Commission decision has failed to favor us with the source of this understanding which takes away most of Mrs. Presnell's $7,000 plus award. The record reflects no "additional compensation for permanent disability."

On the first page of the surety's brief, where after mentioning the laminectomy, the statement of the case goes on to mention the basis of the "understanding":

In the course of that surgery, a blood vessel was accidentally severed, which was repaired. As a result of that procedure, the claimant filed a malpractice claim against Dr. [John Doe] and in that third-party proceeding, settled the same for $10,000. (Deposition of E.G. Kirkpatrick, p. 7, LL. 23–25.) It has been stipulated by the parties through their respective attorneys of record that the claimant received a net recovery in the third-party malpractice suit in the amount of $4,500 after deduction of expenses and attorney fees. (Tr., p. 4, L. 24 to p. 5, L. 8.) The parties have also stipulated that the surety, United States Fidelity & Guaranty Company, *paid all of the medical expenses incurred relative to the repair* of the damage caused by the alleged malpractice. (Tr., p. 5, LL. 14–20.) The parties had stipulated that the exact amount recovered by the claimant after attorney fees and costs in the malpractice claim amounted to $4,534.13. (Tr., p. 6, L. 7 to p. 7, L. 3.) Respondent's Brief, pp. 1–2 (emphasis added).

Not in the context of reciting a further stipulation, that statement continues with this sentence: "The surety at no time waived its right of subrogation for amounts paid." R., p. 2.

Touching first upon the "stipulation," it is readily reproduced from the transcript of the hearing which took place before Chairman Geddes on at least prior to March 31, 1985, that being the date of the Reporter's Certificate. Following is the transcript relative to the "stipulation":

MR. BARRETT: Also, if we might, preliminarily, Your Honor, we would offer stipulation with Counsel that there has been third party proceedings in re-

gard to this matter, a claim made by the claimant against, I believe it was, Dr. [John Doe.] Is that correct?

MR. PIKE: That's correct.

MR. BARRETT: For malpractice in conjunction with surgery which was performed upon her in the form of a laminectomy following this accident, and that the claimant had realized a net recover of—that is, a recovery to her above and beyond attorney fees and costs in the amount of $4500.

*We would offer a stipulation that upon any recovery the claimant may make in these proceedings that there would be* an offset for *a credit to the surety in that amount;* that is, the net recovery only, the $4500.

MR. PIKE: Mr. Geddes, what Mr. Barrett says is correct as far as the amount that is recovered, the net to the client. That is a correct figure. As to whether or not I would stipulate that the surety is entitled to an offset, I am not prepared to do that.

MR. BARRETT: Your Honor, may I inquire as to what the issue may be in regard to that so that we will know in what manner we are to proceed? In other words, *do you agree that the surety has paid all of the medical expenses that were incurred relative to the repair of the damage that was caused by the malpractice?*

MR. PIKE: *Yes,* I would stipulate to that.

MR. BARRETT: And that they have paid any extended income benefits resulting from that procedure included in the payments that they have made?

MR. PIKE: Here is what I don't know: *I have not seen the figures as to how much the surety has paid with reference to the additional medical procedure that was required.* I have not been furnished that information. And I also do not know how much actual extension of care this lady needed because of the alleged malpractice of Dr. [John Doe]. If I could have that information, perhaps then I could enter into a stipulation.

MR. BARRETT: Your Honor, we would request that if there is an issue on this that we be, of course, permitted to, in our case in chief, after the claimant has proceeded with theirs, that we be permitted to produce any evidence by way depositions or documentary evidence in order to establish the right to a setoff for a credit.

MR. GEDDES: I think that would be the way to proceed. What was the result of the third party settlement?

MR. BARRETT: It was a $10,000 recovery, gross; but after attorney fees and costs, I understand that the claimant received a net of $4500. Is that correct, Mr. Pike? I believe that was in an answer to an interrogatory.

MR. PIKE: I do have the exact figure right to the penny. I will look that up.

MRS. PRESNELL: $4534.13.

MR. BARRETT: $4538.14.

MR. GEDDES: We have a stipulation, as I understand it, that that was the amount that the claimant received?

MR. PIKE: That's correct. Tr., pp. 4–7.

Even though the Commission did not set forth the only stipulation (understanding) which was mutually agreed to, *i.e.*, a finding that counsel were agreed that Mrs. Presnell would reimburse USF & G for the medical expenses attendant to repairing the severed artery, the transcript suggests such a finding.

The deposition of a Mr. Kirkpatrick supposedly was taken to provide the surety's opportunity to prove what it had actually expended in expenses repairing the severed artery, if in fact it did so. The deposition was not taken until June 13, 1985. Because it only encompasses ten pages, rather than supply an *understanding* of what I make of it, a better course seems to first expose its pertinent content verbatim, other than to first point out that Mr. Kirkpatrick identified himself as a Boise resident and retired after 35 years of employment for the USF & G:

"Q. ... And directing your attention to the Dorothy Mae Presnell file, this involves an accident which occurred on or about

December 26, 1979 involving a back injury; is that your understanding?

"A. That's correct.

"Q. And is it your understanding this lady was treated by an orthopedic surgeon in the form of Dr. [John Doe]....?

"A. Yes, that's correct.

"Q. During the course of that surgery, what was your understanding as to what occurred during the surgery to her back and laminectomy?

"A. In the surgery to her back, that the surgeon, Dr. [John Doe], slipped and cut some major artery.

"Q. All right. And what is your understanding as to what then occurred after that happened?

"A. That they got with—Dr. [John Doe] and, I presume, his assistant located Dr.—

"Q. that would be Dr. McCain?

"A. Dr. McCain, and they took her into another operating room and within a short period of time—and I'm talking about the same day—repaired the cut or injury to the artery, Dr. McCain did.

"Q. Okay. At this time, Mr. Pike, would you—or let me ask a few more questions so that makes sense.

"At some time subsequent thereto, what is your understanding of whether or not there was a claim made against Dr. [John Doe] as a third party claim? Yes, against Dr. [John Doe].

"A. State that—what was the question? I missed it.

"Q. What was your understanding in reference to a claim by the claimant as against Dr. [John Doe] for malpractice? Did she make such a claim?

"A. On, yes, she made—I—

"Q. Who was her lawyer?

"A. For that purpose?

"Q. For that purpose.

"A. It was—

"Q. Would it be Walt Bithell?

"A. Walt Bithell.

"Q. Here in Boise; is that correct?

"A. That's correct.

"Q. Now, have you been acquainted with Mr. Bithell for some time?

"A. I've met Mr. Bithell and he has represented us in one matter before.

"MR. BARRETT: All right. Now, Mr. Pike, may we stipulate that the amount expended by USF & G *in compensation benefits* at least equals the amount of the net recovery that the claimant made in the malpractice case against Dr. [John Doe], which amount is $4,543.13?

"MR. PIKE: Yes. I'd stipulate to that.

"Q. BY MR. BARRETT: All right. Were you informed as to a settlement that was reached in conjunction with the third party case as between Mrs. Presnell and the carrier for Dr. [John Doe]?

"A. Yes, I was so informed.

"Q. And what was your understanding as to the total amount of that settlement?

"A. The total settlement was $10,000.

"Q. All right. Now, at the outset, that is, after the laminectomy had been performed, Dr. McCain had treated the claimant, had you had a discussion with the claimant or anyone else in conjunction with a potential third party claim as against Dr. [John Doe]?

"A. I'm not sure that I understand your question. I discussed this case with Mrs. Presnell and some other members of her family, and Mr. Berry and Mr. Pike, lawyers, and which discussion took place in Mrs. Presnell's home, and I remember that there was some anguish expressed by her and members of her family about the treatment that they had received in this case, the medical treatment.

"Q. All right. Do you remember approximately when that discussion took place?

"A. It would be sometime in the spring of 1980.

"Q. All right.

"A. I do have a memo that I made from there. I could tell you I think exactly if I could find it.

"Q. You think it was sometime in the spring of 1980?

"A. April 24, 1980.

"Q. All right. At that time, *was there any discussion concerning a subrogated interest for the USF & G?*

"A. *My notes do not reflect any discussion on that—*

"Q. Okay.

"A. —question.

"Q. *Do you recall any discussion at that time?*

"A. *I do not recall any discussion at that time.*

"Q. All right. Now, at a later date, did you have a further discussion with either Mr. Bithell or Mr. Pike or anyone concerning the settlement of the third party claim and the subrogated interest of USF & G?

"A. I would think that it would be sometime in 1984. It was done at the time that Mr. Bithell was in Mr. Pike's office. I was so informed, and the settlement was to be achieved at that time.

"Q. Had the settlement been finalized or were they discussing it with you?

"A. The amount had been finalized.

"Q. Okay.

"A. The discussion was whether I would allow the settlement to go through or whether I would insist upon entering into an agreement and receiving part of the money.

"Q. All right. Do I understand that the settlement has been finalized or was it subject to your approval?

"A. Been finalized.

"Q. That had already been agreed upon?

"A. As to amount, yeah.

"Q. Okay. Tell me as best as you can remember the discussion that you had with Mr. Pike on the telephone at that time.

"A. Well, my recollection was that for one thing, I felt that it struck me that the settlement made by Bithell was cheap.

"I didn't think he got enough. Be that as it may, I agreed to let the thing go. We

would not be involved in that settlement, and that Mr. Pike was going to pursue a comp claim and was going to make a claim for physical disability as distinguished from impairment, *and that we would argue our share of any recovery out of that amount of money, whatever it was.*

"In other words, we would—we would use that as a source of money for our subrogation interest.

"Q. Rather than taking it at that time?

"A. Rather than taking it at this time and holding up this settlement, which apparently they wanted to get done properly.

"Q. Well, now, I need some clarification. You talk about holding up the settlement. My question is was it your understanding that $10,000 had been agreed upon subject to no contingency with a third party, or was the settlement between the claimant and the third party in some way contingent upon your okaying it because of your subrogated interests? You understand my question?

"A. I'm not sure whether I do understand it. I will say this. It is my understanding that Walt Bithell wanted to get this matter cleared up.

"We orally agreed then that we would not insist that any money paid by Dr. [John Doe]'s carrier be paid to us, so that—that malpractice action could be settled and payment could be made then and there or however fast they could do it without any payment or signing of any drafts or anything by the USF & G.

"Q. All right.

"A. *And my understanding was that we would discuss this later with Mr. Pike, and he agreed to that and that was enough for me.*

"Q. All right. So do I understand that if there would be no recovery by Mrs. Presnell in the Worker's Compensation case over and above what she has received to date, that is, the 10 percent rating, that USF & G would not make a claim back against Mrs. Presnell worth $4,500?

"A. We would not attempt to get any recovery from what we have paid to—

"Q. Well, let us assume in the Presnell case that she recovered an additional $5,000 over and above what she's been paid because of "disability over and above the impairment."

"What was your understanding of what would be the result insofar as the 4,500 subrogated interest is concerned?

"A. That *we would be able to take credit for our subrogated interest against anybody that we might have to pay subject* to a negotiated amount.

"Q. Did you at any time agree with Mr. Pike or Mr. Bithell to waive your subrogated interest?

"A. No.

"Q. Was it your understanding under the Worker's Compensation law that any subrogated interest of the surety was automatically carried with the claimant's case against the third party, subject to attorneys' fees and costs?

"A. Yes.

"MR. BARRETT: I have no further questions. Thank you.

EXAMINATION

BY MR. PIKE:

"Q. Mr. Kirkpatrick, did you ever make any arrangements with Mr. Bithell concerning the interest of USF & G as related to the interest of Mrs. Presnell as far as the medical malpractice case was concerned?

"A. No specific arrangements.

"Q. I mean, did you ever even have a discussion with him about the case?

"A. I discussed it with him at one time a long time ago that *we were involved with the case, we had paid medical bills* and—at which time he said he would keep us informed.

"Now, he never did, but then that's Bithell for you.

"Q. Did you have any arrangement with Mr. Bithell to assist in the cost of that prosecution as against Dr. [John Doe]?

"A. No.

"Q. Did USF & G have any—

"A. We had no arrangement with him financially or otherwise, other than what I understood was the statutory arrangement.

"Q. *Did you discuss the statutory arrangement with him specifically?*

"A. No.

"Q. The only discussion that you had with Mr. Bithell, then, as I understand it, is that you did talk to him on the telephone, advised that you had a financial—USF & G had a financial interest in the case; is that what it was?

"A. Yes, that we were involved in the comp case as to our understanding of what happened.

"Q. And that would be—

"A. I mean, what—what was allegedly the malpractice.

"Q. That would be the extent of it?

"A. That was the extent of our conversation, right.

"Q. Was there any arrangement between you and Mr. Bithell that he would not settle the case, medical malpractice case, without checking with you and getting your permission or advising you—

"A. No.

"Q. —as to what he was going to do?

"A. We didn't discuss it, no.

"Q. In other words, as far as you were concerned, he could handle that case in any way he wished at his discretion?

"A. Essentially, yes. He was a—I would assume that he's a good lawyer. He tells me he is, and that he knows the law on Workmen's Comp subrogation." Deposition of Gene Kirkpatrick, June 13, 1985, pp. 5–14 (emphasis added).

The very best that could be said of the source of the "understanding"—Commission Finding No. XIV, is that any subrogation rights of USF & G would be respected and that the only claims which Mr. Pike recognized on behalf of his client were any medical expenses paid for repairing the artery, with Mr. Kirkpatrick saying that USF & G *had paid medical bills.* The record, however, shows that USF & G claimed, and the Commission gave away, a lump sum

which was *all* that Mrs. Presnell had left to her following settlement of the malpractice claim. Nothing in the record sustains that USF & G paid out $4,500 or any amount whatever in repairing the artery. Factually, there is in the record no evidence of any amount actually being paid out. Mr. Kirkpatrick did say that medical expenses had been paid out, but no amount was stated, no bills were submitted in evidence, leaving the evidence insufficient.

Accordingly, I whole-heartedly agree with the majority's statement that "the record is devoid of any findings or testimony [or exhibits, I would add] as to the medical expense. I see nothing in the record which I have incorporated herein to sustain the majority in adding "and convalescence" to medical expenses incurred in the iliac artery repair, and strongly protest against the majority's opening up something on remand that was never mentioned between counsel, never "understood," never stipulated to, and also highly unlikely.

Mrs. Presnell's $4,500 has been in USF & G's bank account for a long, long time. This Court should be insisting that she receive judgment interest on that amount. Moreover, she should receive that amount and interest forthwith, and she should also be awarded attorney's fees so that the amount wrongfully withheld from her comes to her intact.

Above all, she is entitled to the sure and certain relief promised all claimants by the Workmen's Compensation Act—meaning *now*, not years down the road, and without the surety being gratuitously allowed a second opportunity to prove medical expenses paid in repairing the repair to the iliac artery. Although Mr. Kirkpatrick and Mr. Pike seemed to be in accord that there was such an agreement, pure surmise on my part is that Dr. McCain most likely donated those surgical services as a brotherly gesture to a fellow doctor. Why else, one wonders, did the surety, ably represented, not place in evidence the bills for that artery repair? Remember, Mr. Pike, at the hearing before Commissioner Geddes, said that if he were to be furnished a statement of those expenses, he *would*

stipulate as requested by counsel for USF & G.

Back of it all, in considering attorney's fees for Mrs. Presnell, and all of this Court's many cases talking about frivolous or nonmeritorious claims, the claim which USF & G laid on Mrs. Presnell's $4,500, whether based on a statutory provision which does not exist, or a give-away stipulation which never took place, is an all-time high in overreaching an assured, to whom some authority says USF & G stands in a fiduciary relationship. Its claim to that $4,500 was factually unsupported and grounded on no principles of law.

Justice Bakes in footnote 1 of his opinion set forth Mrs. Presnell's statement of what Justice Bakes calls the *sole* issue. The first sentence states one issue. The second sentence stated the *second* issue, and it is that issue alone which has caused my concern as to the commission's decision. Not to his credit, Justice Bakes can not say that the parties did not recognize the issue—not where the surety's brief at page 3 recognizes it as an additional issue.

4. Whether defendants are entitled to an offset for recovery made by claimant against a third party under the provisions of Idaho Code § 72–223 to the extent of the net recovery of claimant in said third-party action, that is, recovery of amounts less her attorney fees and costs.

The discussion of what Justice Bakes sees as an issue not before us begins at page 29 and encompasses the remaining seventeen pages of the brief. Moreover, the surety's brief in opening discussion of the $4,500 setoff problem refers to it as "The further issue involved in this case ...," used in the brief of Mrs. Presnell, as set forth in Justice Bakes' footnote 2.